**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Marcellus S. MERRILL and Geraldine R. Merrill, Co-Partners, d/b/a Merrill Axle and Wheel Service, Respondent.**

No. 9424.

United States Court of Appeals
Tenth Circuit.

Jan. 17, 1968.

Nancy Sherman, Washington, D. C., for petitioner.

Harold B. Wagner, Denver, Colo., for respondent.

Before WOODBURY,* BREITEN-STEIN and HICKEY, Circuit Judges.

WOODBURY, Senior Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board.

The Merrills are husband and wife and also partners in two business enterprises. As Merrill Engineering Laboratories, Engineering hereinafter, they are engaged in the invention, design and manufacture of electronic equipment for balancing all kinds of rotating parts. As Merrill Axle and Wheel Service, Axle and Wheel, the Company or the respondent hereinafter, they provide motor vehicle front end service, i. e., alignment, wheel balancing, frame straightening and steering gear repair, at three shops in metropolitan Denver and to some extent at a fourth shop 120 miles away in Pueblo, Colorado.

On May 7, 1965, two mechanics working in the same Denver Axle and Wheel shop visited the local office of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 775, hereinafter the Union, to discuss organizing their fellow employees at the respondent's Denver shops. At that time they filled out and signed cards authorizing the Union to represent them as their collective bargaining agent and obtained a supply of similar cards for submission to fellow employees in the Denver shops.

Organizing proceeded apace and by May 11, 14 of 23 rank and file employees in the three Denver Axle and Wheel shops had signed authorization cards. On May 14 the Secretary-Treasurer of the Union sent a letter by certified mail addressed to the Company's office advising that a majority of the rank and file employees at Axle and Wheel's three Denver shops had authorized the Union to act

---

* Senior Circuit Judge of the First Circuit, sitting by designation.

as their collective bargaining agent and enclosed photo-copies of the 14 authorization cards to substantiate the assertion. On the same day the Union's president accompanied by its organizer called upon Mr. Merrill at his office. They introduced themselves, said they had come to prove that the Union represented a majority of the local Axle and Wheel employees, and, presenting a copy of the Secretary-Treasurer's letter of the same day and its enclosed authorization cards, asked the Company to recognize the Union for the purpose of collective bargaining. Mr. Merrill examined the cards carefully, made a list of the names thereon with the Union officials' consent and, questioning whether the Union had a majority, called his bookkeeper in an adjoining office for a report on the number of Axle and Wheel employees in the Denver shops. The bookkeeper soon returned with a slip of paper bearing the figures 5, 13 and 5 and after that Mr. Merrill never again questioned the Union's majority. After further conversation the exact purport of which is in dispute, the Union officers drew Mr. Merrill's attention to the request in the Union's letter for a meeting on the following Tuesday to discuss a collective bargaining agreement. Mr. Merrill responded by saying that he was a very busy man and asked if the general manager of Axle and Wheel's Denver shops might attend in his place. The Union officers said they would be glad to meet with anyone Mr. Merrill chose to designate but questioned the general manager's authority to negotiate for the Company. Mr. Merrill explained that the general manager had authority to meet with the Union officers but did not have authority to enter into any contract because the Company would not "do anything" until the Union had organized the Company's competition in "all the rest of Denver." With that the meeting ended. A day or two later Mr. Merrill posted photo-copies of the employees' authorization cards on the bulletin boards in the respective shops.

On the Monday following the meeting on May 14th, that is to say on May 17th, the general manager left a telephone message for the Union president, who was out, to say that by reason of the absence of the Company's counsel he would be unable to meet with the Union officers the next day. The general manager declined to give a telephone number where he could be reached but said he would call back if there were any change. He did not call back and neither the Company nor the Union made any further effort to negotiate.

Mr. Merrill learned of the Union activity in the Company shops by what he called the "grapevine" almost as soon as it began. Very soon, he could not give the exact date, Mr. Merrill went to one of the shops and called the men together. What he told them is in dispute. He said that he expressed general approval of unions, that he had operated a shop for years in Des Moines, Iowa, under a union contract and made greater profits than he had made in Denver without a union, but added that it would be impossible for him to sign a union contract "unless all the competitors and other automotive concerns in Denver did the same, just like they did in Des Moines." He concluded the meeting by asking, so he said, for a general expression of union views. He testified: "I don't remember for sure, but I think I asked a few of the men around me how they would rather have it. I think I did. And some of them spoke up and some of them didn't." When asked if it was a general question or posed to the men one by one he said: "I just addressed it to them, and said, 'I'd like to have your expressions.'"

█ Some of the men at the meeting gave a different version. They said that they were asked for their union views separately one by one and that Mr. Merrill told them that under a union contract the men would make less money, that they could be laid off during the winter months when work was slack and that they would lose the Company's profit sharing plan. The trial examiner credited the testimony of the employees and also testimony of other anti-union state-

ments and actions by supervisory employees of the Company.[1]

A detailed statement of the often conflicting testimony as to what supervisor said or did what to whom on various occasions at each of the Denver shops would expand this opinion to inordinate length without serving any useful purpose. It will suffice to say that scrutiny of the record as a whole in conformity with the rule laid down in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), discloses credible evidence to support the trial examiner's finding of a broad effort by all of the respondent's supervisors and the managing partner to dissipate union support by threats of reprisal and promises of benefits together with interrogation in a context coercive in nature, and also to support the trial examiner's conclusion that the respondent had violated § 8(a) (1) of the Act by questioning employees concerning the Union, by threatening employees with loss of overtime, lower wages and layoffs during slack periods if unionized, by threatening abandonment of bonus and profit sharing plans and wage increases, by threatening authorization card signers with discharge, and by promising employees a shorter work week and Saturdays off, all in the context of a union organizational campaign.

Procedurally this case began with a complaint and notice of hearing based on an amended charge filed with the Board by the Union asserting anti-union activity and refusal to bargain collectively by both Axle and Wheel and Engineering.[2] The Board's complaint alleged that Axle and Wheel and Engineering constituted a single integrated business enterprise under common ownership but alleged unfair labor practices only by Axle and Wheel

and described the appropriate bargaining unit as: "All employees employed by Respondent at 1200 Acoma Street, Denver, Colorado; 1029 West Third Avenue, Denver, Colorado; and 10111 West Colfax, Lakewood, Colorado, but excluding office clerical employees, salesmen, guards, watchmen, professional employees, and supervisors as defined in the Act." [3]

In its answer the respondent admitted that the unit described above was appropriate for collective bargaining purposes.[4] But it not only broadly denied commission of any unfair labor practices but also alleged that the complaint failed to state facts to show that the respondent was engaged in commerce or in business affecting commerce under the provisions of § 2(6) and (7) of the Act. An amended complaint was then filed listing over one hundred customers of Axle and Wheel from July 1, 1964 to July 1, 1965, alleged to be engaged in "commerce" or in a business "affecting commerce" with the dollar amount of goods or services furnished by the respondent to each. The respondent countered by amending its answer to admit furnishing goods or services to some of its customers as listed in the amended complaint but to deny the furnishing of any goods or services to certain others, to claim no knowledge of the nature of the business of another group of alleged customers and to deny that still others were "a legal entity," or that it had provided goods or services to "a business having any similar name in the amount alleged." The answer also asserted that the amount of business done at the Pueblo shop for concerns engaged in commerce was immaterial. The case came before the trial examiner for hearing in this posture.

At the hearing, insofar as not admitted in the answer, the nature of the various

1. We reject respondent's contention that it is not to be charged with the conduct of these men because, although they were supervisors, they were not clothed with any responsibility for the respondent's labor policy. Furr's, Inc. v. NLRB, 381 F.2d 562, 565, 566 (C.A.10, 1967).

2. The original charge was brought against only Axle and Wheel.

3. These are the only locations alleged to be involved in this proceeding. Engineering, although located adjacent to one of the Axle and Wheel shops is in a separate building and has a separate address.

4. Its counsel also so stipulated at the hearing before the trial examiner.

businesses of the alleged customers as either in "commerce" or in "a business affecting commerce" in the statutory sense was either proved or stipulated. That issue seems to have dropped out of the case. What remains is the question of the misnomer of some of the alleged customers, the variance between the amount of business proved to have been done with some specific customers and the amount of business alleged to have been done with those customers, and also the question whether for jurisdictional purposes the business done at the respondent's Pueblo shop should be considered in determining the gross business done by the Company.

The trial examiner resolved these issues against the respondent and found in consequence that during the year involved Axle and Wheel had "performed services valued in excess of $50,000 for firms in interstate commerce over whom the Board would assert jurisdiction." [5] Finding that the respondent's operations affected commerce, the trial examiner went on to find interference, restraint and coercion of employees in their efforts to unionize, and refusal to bargain with the Union. The Board sustained the trial examiner's rulings and, adopting his findings, conclusions and recommendations, issued its usual order. It will be enforced.

Counsel for the respondent opposes enforcement of the Board's order on several grounds. Basically, he says that the Board lacks jurisdiction over the respondent. We do not agree.

■ Counsel for the respondent asserts that the business done by the Pueblo shop should be excluded from computing the gross business done by the Company. And he argues that the allegations of the amended complaint are what he calls "judicial admissions" by which the Board is rigidly bound, so that it is estopped from showing that the Company's dealings with firms whose correct legal names differ somewhat from their names as set out in the amended complaint and also from showing that the dollar amount of the Company's business with firms correctly named exceeded the amounts specified in the complaint.[6]

■ It was not error to include the business done at the Pueblo branch in determining the amount of business done by the respondent even though only the Denver shops are here involved. It has long been well established that all of the operations of an employer are to be considered in determining whether its operations adversely affect commerce and so bring the employer within the ambit of the broad jurisdiction conferred on the Board by Congress in the full reach of its constitutional power.[7] See NLRB v. Virginia Electric & Power Co., 314 U.S. 469, 476, 62 S.Ct. 344, 86 L.Ed. 348 (1941); NLRB v. Drummond, 210 F.2d 828 (C.A.6, 1954); NLRB v. Weyerhaeuser Timber Co., Clemons Branch, 132 F.2d 234 (C.A.9, 1942); NLRB v. Local Joint Executive Board etc., 301 F.2d 149, 151, 152 (C.A.9, 1962).

■ There were undoubtedly several variations between the names of the respondent's customers as alleged in the amended complaint and the legal names of the customers. For instance International Harvester Company was set out in the amended complaint as International Harvester and Sears Roebuck and Company only as Sears Roebuck. And clearly the amount of business proved to have been done with a number of cus-

---

5. Having found that the amount of business done by Axle and Wheel alone was sufficient to bring it within the Board's discretionary jurisdictional standard, the trial examiner and the Board saw no need to consider whether Axle and Wheel and Engineering constituted a single integrated employer.

6. Computations made by counsel based upon his contentions show that the gross revenue of the respondent from firms engaged in commerce was substantially less than $50,000 for the year involved.

7. NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963), and cases cited.

tomers exceeded the nominal amount alleged in the amended complaint. Respondent's argument that misnamed customers should not be considered at all in computing the amount of business done by the respondent with concerns in "commerce" or in a business "affecting commerce," and that only the lesser amount of business alleged should be considered in computing the respondent's gross business with concerns correctly named, rests upon a rigid view of pleading fortunately long since relegated to the limbo of the law. Today pleadings can always be amended to conform to the evidence when justice so requires, see Rule 15(b) Fed.R.Civ.P., and certainly no injustice would result in this case, for the customers' names were taken from the respondent's ledger cards, and certainly it knew from its books precisely how much business it had done with its individual customers. The trial examiner and the Board properly found that the respondent had done work for businesses operating in interstate commerce in excess of $50,000 during the year in question This is enough to satisfy the "self-imposed jurisdictional standards of the Board." NLRB v. Marbro Food Service, Inc., 366 F.2d. 477, 478 (C.A.10, 1966), quoted with approval in NLRB v. Breitling, 378 F.2d 663, 664 (C.A.10, 1967).

It is clear that 14 of the 23 employees in the admittedly appropriate bargaining unit put their names to union representation cards. But counsel for the respondent contends that nevertheless Mr. Merrill entertained a good faith doubt of the Union's majority when he met with the Union's officers on May 14, 1965. And he also contends that some cards were obtained by false representations and threats. Furthermore he contends that according to the admissible evidence adduced at the hearing, only 9 employees signed cards. We consider these contentions in inverse order.

Nine union authorization cards were identified at the hearing by the employees who actually signed the cards, and were admitted in evidence. Five more cards were identified by some witness who testified that he knew the man whose name appeared on the card and that he saw the man fill out the card and write his name on it. Counsel for the respondent contends that the admission of these 5 cards in evidence constituted a flagrant violation of the "basic principles" of the hearsay rule.

 The union authorization cards speak clearly for themselves. They read: "I authorize Local 775 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America to represent me as my collective bargaining agent." Below this unambiguous statement on the top of the card are spaces to be filled out with the name of employer, kind of work performed, address, telephone number, date and signature. The situation then is that a witness on the stand gave testimony that he saw a known fellow employee give the union authority to represent him for collective bargaining purposes. This is not "written hearsay," as counsel for the respondent calls it, but direct evidence of the creation of an agency relationship between a fellow employee and the Union. It is as though a witness testified that he heard P employ A as chauffeur at a stated remuneration and under stated conditions and heard A accept the employment. The authentication of the signatures on the cards is, of course, by direct evidence. The witness saw the fellow employee write his name. The 5 cards were properly admitted in evidence. NLRB v. Economy Food Center, Inc., 333 F.2d 468, 471 (C.A.7, 1964); Colson Corp. v. NLRB, 347 F.2d 128, 134 (C.A.8, 1965).

 Counsel for the respondent challenges the validity of several cards on the ground that some were obtained by misrepresentations and others by threats. The trial examiner considered these contentions seriatim and rejected them all. The Board adopted his findings. We shall not consider each asserted instance of misrepresentation or threat separately.

It will be enough to say that the record supports the trial examiner's finding that although card solicitors had said when soliciting some cards that "most" or a "majority" had already signed, the record did not establish that the statements were false. He said that it could not be determined from the record whether the statements applied to a specific shop or to the unit as a whole or whether, at the time of day the statements were made, the Union did not actually have "most" or a "majority" of the employees in the shop or unit already enrolled. The record also supports the trial examiner's finding that although perhaps one employee may have been pressured into signing, the pressure was dissipated by the employee's voluntary attendance at two union meetings after he had signed. The fact that two employees revoked their union authorization cards, one on June 2nd and the other on June 3rd, 1965, obviously has no bearing on the Union's majority status some three weeks earlier, on May 14th, when Mr. Merrill said he would not enter into a collective bargaining agreement until his competitors were organized.

 The record does not support the contention that Mr. Merrill had a good faith doubt of the Union's majority on May 14th. On that day he was shown 14 photo-copies of union authorization cards and, checking with his bookkeeper, he found 23 employees in the unit. He never again raised the majority question and there is no evidence that he then had any suspicion that any cards had been obtained by fraud or coercion. On his own testimony the reason for his refusing to bargain was that he would not do so until the Union had organized his competitors. This, of course, is not a valid reason.

In summary, we conclude that the Board had jurisdiction, that it fell into no error of law and that there is evidence in the record considered as a whole to support the Board's findings and conclusions.

The order of the Board will be enforced.