**McLANE/WESTERN, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 81–1081.**

United States Court of Appeals, Tenth Circuit.

Dec. 22, 1983.

---

Kenneth R. Stettner, Atty., Denver, Colo. (Robert R. Miller of Good & Stettner, P.C., Denver, Colo., were on brief), for petitioner.

Linda Weisel, Atty., National Labor Relations Board, Washington, D.C. (Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Peter Winkler, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, Washington, D.C., were on brief), for respondent.

Before HOLLOWAY and McWILLIAMS, Circuit Judges, and TEMPLAR, District Judge *.

HOLLOWAY, Circuit Judge.

This petition for review by McLane/Western, Inc. (the company) challenges the National Labor Relations Board's decision in 251 NLRB No. 175 that the company's pre-election conduct violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), and that the company's post-election discharge of an employee violated §§ 8(a)(1) and (a)(3) of the Act, 29 U.S.C. §§ 158(a)(1) and (a)(3). The Board has cross-petitioned for enforcement of its order. We conclude that there is substantial evidence on the record considered as a whole to support the Board's finding that the company's pre-election conduct violated § 8(a)(1), and enforce the portion of the Board's order in that respect. In light of the recent Supreme Court decision in *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), we remand for a determination whether the company would have discharged the employee, regardless of his protected conduct in connection with union activities.

I

*Background*

The company is engaged in the sale and distribution of food and related grocery products. III R. 569. The company's warehouse in Denver, Colorado, stocks approximately 12,000 different items and maintains inventory valued at several million dollars. The company is a subsidiary of McLane and Co. of Texas. Drayton McLane is President of McLane and Co. Neil McCarty is divi-

---

* The Honorable George Templar of the United States District Court for the District of Kansas, sitting by designation.

sion president of the company. Stephen Jacobson is the warehouse manager. Patrick Johnson is a shift supervisor.

On May 1, 1979, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 435 (the union), filed a representation petition with the Board's Denver Regional Office, seeking to represent the company's employees. I R. 410. After a hearing, the Board directed that a union election be conducted at the company. *Id.* at 411. The company conducted an extensive handbill campaign against the union. II R. 489–546. At the secret ballot election held on June 28–30, 1979, sixty eight company employees voted against the union while forty two employees voted for the union.[1] I R. 422.

On July 9, 1979, the union filed objections with the Board, alleging that the company's conduct before the election interferred with the employees' rights under § 7 of the National Labor Relations Act, 29 U.S.C. § 157. II R. 424–25.[2] On July 17, the union filed an unfair labor practice charge against the company, alleging that the company discharged an employee, Keith McFarland, on July 11 in order to discourage membership in a labor organization. The union amended its unfair labor practice charge to include allegations that the company had "engaged in numerous instances of unlawful interrogation and threats of reprisals against its employees because of their union activities." *Id.* at 547–48.

A consolidated hearing was held before an administrative law judge in Denver, Colorado, on December 6 and 7 to consider both the union's objections to the election and the unfair labor practice charges. The ALJ found that the company's pre-election conduct violated § 8(a)(1) and that the discharge of McFarland violated §§ 8(a)(1) and (a)(3), and ordered that McFarland be reinstated. The company filed objections to the decision of the ALJ. The Board adopted the "rulings, findings, recommendations, and conclusions" of the ALJ and his recommended order. The Board's ruling that a second election be held is not at issue here. The company's motion to reconsider the Board's decision was denied by the Board. This petition for review and cross-application for enforcement followed.

## II

### *Pre-election conduct*

Section 7 of the Act grants employees "the right of self-organization, to form, join or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) implements § 7 by making it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise" of those rights. 29 U.S.C. § 158(a)(1).

We previously have held that interrogating employees about their, or their co-workers', union sympathies, *e.g., Coors Container Co. v. NLRB,* 628 F.2d 1283, 1288–89 (10th Cir.1980); *Groendyke Transport v. NLRB,* 530 F.2d 137, 143–44 (10th Cir.1976), and threatening employees during an organizational campaign with loss of benefits, *e.g., NLRB v. Merrill,* 388 F.2d 514, 517 (10th Cir.1968); *J.C. Penney Co. v. NLRB,* 384 F.2d 479, 480–82 (10th Cir.1967), plant closure, *e.g., Ann Lee Sportswear, Inc. v. NLRB,* 543 F.2d 739, 743 (10th Cir.1976); *Singer Co. v. NLRB,* 480 F.2d 269, 271 (10th Cir.1973), and physical violence, *e.g., Bill's Coal Co. v. NLRB,* 493 F.2d 243, 245 (10th Cir.1974); *NLRB v. McBride,* 274 F.2d 124, 127 (10th Cir.1960), may violate § 8(a)(1).

■ The ALJ found that "[b]y interrogating employees concerning their union activities and sympathies and about the union activities and sympathies of their fellow employees, by threatening plant closures, loss of existing benefits and having to bar-

---

1. Approximately 120 employees were eligible to vote in the election. II R. 422.

2. The union claimed that the company (1) "engaged in coercive interrogation," (2) "threatened physical violence," and (3) "engaged in a campaign of harassment, intimidation, and reprisal." *Id.* at 424–25. The union later withdrew its charges that the company unilaterally changed working conditions and misrepresented the number of employees in the bargaining unit. *Id.* at 426.

gain from scratch should employees select a collective-bargaining representative, and by threatening to punch an employee in the nose for having initiated the organizational campaign by the union, [the company] violated Section 8(a)(1) of the Act." III R. 585. The Board adopted these findings. *Id.* at 614. We conclude that there is substantial evidence on the record considered as a whole to support the findings. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Safeway Stores, Inc. v. NLRB,* 691 F.2d 953, 956 (10th Cir.1982).

First, the ALJ found that on several occasions company management individually questioned employees concerning the upcoming union election. In this connection there was evidence that cigarette department leadman Rod Townley testified that warehouse manager Jacobson called Townley into his office soon after the first company handbill was distributed. According to Townley, Jacobson asked him which employees supported the union and whether it enjoyed majority support. I R. 122; III R. 571. When Townley told Jacobson that he was not involved with the union and thus could not answer the question, Jacobson responded, "Come on, you don't think I am a fool, do you," and asserted that Townley "work[ed] with the ringleader," whom Jacobson identified as Dan Shields. *Id.* Jacobson later gave a subsequent company handbill to Townley and again asked if the union enjoyed majority support. I R. 123, 142–43. Jacobson denied that he asked these questions or made the statements attributed to him by Townley. *Id.* at 340–41. Townley also testified that first-shift supervisor Johnson gave him a handbill on two occasions and asked him how things were going with the union. *Id.* at 741.

Division president McCarty met with cigarette department employee Shields on several occasions concerning company handbills. Shields testified that during one meeting McCarty asked him if other employees were actively involved in the union. *Id.* at 188–89. McCarty denied questioning Shields about the union. *Id.* at 302, 304, 305.

General merchandise department employee Faye Binkley testified that on two occasions Jacobson questioned her about the union's support among the employees. In the second conversation, when Binkley responded that she knew of at least two employees who were going to vote against the union, Jacobson asked her to name these two employees. Binkley refused to identify these anti-union employees. III R. 574; I R. 163–66, 170–75. Jacobson denied that he questioned Binkley about the union. I R. 341–A to 341–B.

Second, the ALJ found that on several occasions company management threatened individual employees with loss of benefits, plant closure and physical violence. In this connection Shields testified that McCarty told him on more than one occasion that the employees would lose benefits if the union won the election. Shields said that McCarty told him that the employees would lose their profit-sharing plan (I R. 184); that the company was "morally opposed" to a union shop and would "close their doors and move the company away" rather than deal with the union (*id.* at 190); that employee wages could be lowered (*id.* at 191); that the company could not be forced to "deal with the union if we don't want to" (*id.* at 191); and that the company could "tie [the election] up in the courts for years to come" (*id.*). McCarty denied making these statements. Binkley testified that Jacobson told her that unionization could result in the loss of company benefits. *Id.* at 164, 171; III R. 574, 579. Jacobson denied making such statements. I R. 341–B.

Two days before the election, company president McLane visited the warehouse to discuss with cigarette department employee John Thomas the possibility of Thomas riding a bicycle from Denver to the company's Texas headquarters as a promotional stunt. The next day McLane returned to discuss the matter further. Shields offered to serve as Thomas's agent. McLane responded to Shields that "I am already mad enough to punch you in the nose." III R. 574; I R. 193. McLane admitted making the statement but asserted that it was made "in humor." III R. 574; I R. 372.

The company argues that the ALJ improperly credited the employees' testimony. It questions the veracity of the employees and points to alleged internal inconsistencies in their testimony. The ALJ, however, explained in detail his reasons for crediting certain testimony. *See* III R. 578–82. We often have stated that we will refuse to substitute our judgment on the credibility of witnesses for that of the ALJ, absent "extraordinary circumstances":

> Merely because the ALJ believed the employee's story does not furnish reason to overturn his credibility determinations. The ALJ advanced good reasons for his appraisal of credibility, and it is not for this court to substitute its weighing of credibility for that of the ALJ absent extraordinary circumstances.

*NLRB v. Dillon Stores,* 643 F.2d 687, 692 (10th Cir.1982) (citation omitted). *See also NLRB v. Wilhow Corp.,* 666 F.2d 1294, 1299–1300 (10th Cir.1981) ("Credibility determinations are particularly within the province of the [ALJ] and the Board, and these are generally entitled to affirmance on review."); *NLRB v. First National Bank of Pueblo,* 623 F.2d 686, 691 (10th Cir.1980) ("[W]hen, as here, the issues presented are largely ones of credibility, we will not lightly overturn the decision of the ALJ who had the opportunity to hear the testimony and view the witnesses."); *Osteopathic Hospital Founders Association v. NLRB,* 618 F.2d 633, 636 (10th Cir.1980) (" 'We do not sit as a super trial examiner, and do not weigh the credibility of one witness against another nor do we search for contradictory inferences.' ") (quoting *NLRB v. Montgomery Ward & Co.,* 554 F.2d 996, 999 (10th Cir.1977), and *NLRB v. Central Machine & Tool Co.,* 429 F.2d 1127, 1129 (10th Cir.1970), *cert. denied,* 401 U.S. 909, 91 S.Ct. 870, 27 L.Ed.2d 805 (1971)).

We find no "extraordinary circumstances" here to warrant rejecting the ALJ's credibility determinations. We therefore conclude that the Board's finding that the company engaged in conduct before the election that violated § 8(a)(1) by coercively interrogating employees, and by threatening the employees with loss of benefits, plant closure and physical violence, is supported by substantial evidence in the record considered as a whole.

## III

### *Post-election discharge*

We previously have held that an employer violates §§ 8(a)(1) and (a)(3)[3] if an employee is discharged for engaging in union activity protected by § 7. *See, e.g., NLRB v. Wilhow Corp.,* 666 F.2d 1294, 1301–02 (10th Cir.1981); *NLRB v. Dillon Stores,* 643 F.2d 687, 692 (10th Cir.1981); *NLRB v. First National Bank of Pueblo,* 623 F.2d 686, 692–94 (10th Cir.1980). The ALJ found that the company violated §§ 8(a)(1) and (a)(3) in discharging McFarland two days after the union filed objections to the election "in retaliation for his suspected support of the union and as a further warning to employees of what could happen to them should they support the Union in any rerun election that might be conducted," III R. 585–86, and ordered that McFarland be reinstated, *id.* at 587. The Board adopted the ALJ's findings and proposed order in this respect. *Id.* at 613–14. We conclude that on this issue we must remand for a determination of whether the company would have discharged McFarland regardless of his protected conduct in connection with union activities.

Keith McFarland began working for the company as a forklift operator in April 1978. During his employment he received one reprimand for carelessness in the operation of his forklift. The ALJ found that McFarland had engaged in "relatively minimal" union activity. III R. 582–83. McFarland completed a union authorization card and hosted approximately fifteen impromptu meetings of employees after work at his apartment where the union was one of the topics discussed. After a series of

---

**3.** Section 8(a)(3), in part, provides that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

one-on-one discussions with McFarland, Jacobson concluded that McFarland probably was pro-union. III R. 572 n. 11, 576; I R. 337–38. The ALJ found that the company maintained a policy that "[a]ny employee found guilty of *any* act of dishonesty will be terminated without prior notification." III R. 576; II R. 436, 460 (emphasis in original). The ALJ concluded that the company "had made every effort to inform its employees of the existence of [this] rule and of the consequences of violating it," and that McFarland had been aware of the rule. III R. 576, 582.

On July 10, the day after the Union filed objections to the election, McFarland was operating his forklift in aisle J. He testified that at approximately 11:30 a.m., he noticed a damaged case of crackers on the floor. Although the company maintained a salvage program for damaged foodstuffs, McFarland believed that the crackers were unsalvageable. He began to eat a broken cracker while he continued with his work. III R. 577, 584–85; I R. 48–50. After being notified by another employee of possible pilferage occurring in the area, Jacobson went to aisle J and saw McFarland eating the cracker. McFarland admitted to Jacobson that he was eating a cracker from a damaged case. Jacobson, Johnson and McFarland then briefly discussed the incident. After Jacobson reported the incident to McCarty, McCarty met with McFarland, who admitted eating the cracker. McCarty then suspended McFarland. After checking records to discover how the company had handled similar incidents in the past, McCarty decided to discharge McFarland for eating the cracker. McFarland was informed of the discharge the next day. He was given the opportunity to resign, but refused. III R. 576–77; I R. 7–14, 48–54, 287–89.

■ In reviewing the Board's finding that the discharge violated §§ 8(a)(1) and (a)(3), we are guided by certain general principles. We first must be "mindful that an employer may dismiss an employee for any reason or no reason at all, so long as hostility toward the employee's union activities does not enter into the decision." *Dillon Stores,* supra, at 692. An employer's anti-union motive generally may be proven only by circumstantial evidence. *See, e.g., Head Division, AMF, Inc. v. NLRB,* 593 F.2d 972, 975 (10th Cir.1979); *NLRB v. Montgomery Ward & Co.,* 554 F.2d 996, 1002 (10th Cir.1977). Once evidence is produced raising a reasonable inference of unlawful motive, however, the employer may justify the discharge by proving that it was the product of a "legitimate motivation," *Dillon Stores,* supra, 643 F.2d at 692, and not of the improper anti-union motive, *Wilhow Corp.,* supra, 666 F.2d at 1301; *Head Division, AMF, Inc.,* supra, 593 F.2d at 975.

These principles are consistent with the two-stage allocation of the burden of proof in dual motive discharge cases announced by the Board in *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and recently approved by a unanimous Supreme Court in *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under this standard, the General Counsel has the initial burden of persuading the Board that anti-union animus contributed to the employer's decision to discharge an employee. *See* § 10(c) of the Act, 29 U.S.C. § 160(c). Once the General Counsel establishes his prima facie case, however, the employer may avoid a finding that it violated the Act by proving by a preponderance of the evidence that it would have discharged the employee, even if he had not engaged in the protected conduct. *Transportation Management Corp.,* supra, —— U.S. at —— – ——, 103 S.Ct. at 2472–73. Although *Wright Line* was decided by the Board on the same day as the instant case, the Board did not apply the *Wright Line* standard here in ruling against the company.[4] The ALJ's findings were, of course, made earlier and before *Wright Line.* They

4. The company's Motion for Reconsideration in the instant case directly raised the *Wright Line* issue and objected to the §§ 8(a)(1) and (a)(3) findings concerning McFarland's discharge, citing the test made applicable by *Wright Line.* III R. 617 n. 1, 622.

were, however, adopted by the Board as a whole, without any analysis under *Wright Line.* The findings state that

the Act prohibits employers from watchfully waiting for a reason or pretext that can be seized upon as a means of eliminating union supporters because of that support. Moreover, while a trier of fact is not permitted to substitute his or her judgment for that of the employer with regard to the discipline imposed, it is nonetheless true that "if the employee is a good worker and his breach of the work rules trivial, the more rational explanation for discharge may be invidious motivation."

III R. 583–84.

We are satisfied that the General Counsel made a prima facie case that the "employee's protected conduct was a substantial or motivating factor" in the discharge. *Trans-*

*portation Management Corp.,* —— U.S. at ——, 103 S.Ct. at 2473.[5] The ALJ and the Board, however, did not make the determination under *Transportation Management Corp.* whether the company would have discharged McFarland regardless of any antiunion sentiment. Although admittedly there is weakness in the company's position in that the alleged "pilfering" incident involved eating in the plant a lone broken cracker from a damaged case which was to be destroyed, there is considerable evidence in the record to support the company's defense that it would have discharged McFarland for the alleged pilfering even if he had not engaged in the protected conduct.[6] Indeed, the findings state that the final determination of the motivation for terminating McFarland "presents a very close question." III R. 582. The ALJ and the Board, however, did not make any findings with regard

5. We reach this conclusion for the following reasons. First, although the Board found that "McFarland had engaged in relatively minimal activity on behalf of the Union and there is no evidence that respondent had been aware of the activity in which he had engaged," III R. 582–83, the Board also found that "insofar as the evidence of Respondent's knowledge shows, Jacobson admitted that he had believed McFarland to be prounion." III R. 584. Second, given Jacobson's impression of McFarland's union sympathy, the evidence of pre-election conduct involving interrogation and threats described earlier tends to support the inference that the company's anti-union animus played a part in the discharge. Third, the timing of the discharge lends support to the unfair labor practice charge. McFarland was suspended the day after the Union filed objections to the election, and he was discharged the next day. *Cf. NLRB v. Montgomery Ward & Co.,* 554 F.2d 996, 1002 (10th Cir.1977) (In upholding Board finding that employee was discharged because of his union activities, we noted that "significantly, the discharge occurred only five days after the union filed objections.").

6. The ALJ found that "every time that McCarty had learned of an employee or supervisor having taken merchandise for his own use, that employee or supervisor had been terminated." III R. 583. Although the ALJ recognized that "there is no evidence that any situations had been brought to McCarty's attention where an employee had taken or eaten merchandise insignificant in value, but had not been terminated," the ALJ also concluded that no employee "had ever been terminated for having convert-

ed merchandise so small in value" as the damaged cracker eaten by McFarland. *Id.* Yet McCarty testified that the company policy of discharging any employee for any act of dishonesty does not hinge on the value of the item stolen because if

[y]ou put a dollar limit on something, I think you are opening the door. We carry 12,000 items, and an inventory of several million dollars. You can't draw a line on stealing. Stealing is stealing, whether a penny or a dollar, you just can't open those kinds of doors and make that kind of distinction.

I R. 270. Moreover, there is evidence in the record that on at least two occasions the company discharged employees on facts similar to the circumstances of McFarland's discharge. On July 12, 1979, candy department employee Bob Wilson resigned after being caught eating Starburst candy. III R. 284–85, 318–19 (testimony of McCarty); II R. 470–72 (company records). On September 19, 1979, supervisor Rob Nemath resigned after being caught eating from a damaged box of animal crackers that had been set aside for salvage. III R. 281–83, 318 (testimony of McCarty); II R. 467–69 (company records).

Despite this evidence, General Counsel argues that the company defense was a mere sham. Brief for the National Labor Relations Board at 25–26 n. 13. In effect he argues that this court should disregard this evidence and grant enforcement in full. We cannot agree. We feel this evidence was substantial enough to require direct findings under *Transportation Management Corp.,* and we cannot make such findings.

to the question whether McFarland would have been discharged even if he had not engaged in protected conduct.

The ultimate finding on McFarland's discharge stated only that

[i]n these circumstances, I find that a preponderance of the evidence supports the allegation that [the company] had applied the [anti-pilfering] rule to the consumption of the cracker by McFarland in retaliation for his suspected support of the Union and as a further warning to employees of what could happen to them should they support the Union in any rerun election that might be conducted.

III R. 585. This analysis appears to give no consideration to the defense available under *Transportation Management Corp.* If the findings could be fairly read, with adequate record support, to rule out the possibility that the company could prevail on the defense that it would have discharged McFarland even if he had not engaged in protected activity, then remand might not be necessary. Because we cannot fairly read the findings that way, however, we conclude that we should remand; we should not make findings on the second phase of the *Transportation Management Corp.* analysis in the first instance.[7] The Board therefore should reconsider McFarland's discharge in light of *Transportation Management Corp.,* conducting further proceedings deemed necessary and entering new findings, conclusions and an appropriate order on the issue of McFarland's discharge.

### IV

### *Conclusion*

Accordingly, for the reasons stated the petition for review is denied and enforcement of the Board's order is granted with respect to all issues except that of McFarland's discharge. On the latter issue, the

case is remanded to the Board for further proceedings in accord with this opinion; we retain jurisdiction on that aspect of the case, pending the Board's further proceedings, findings, conclusions and order on the issue of McFarland's discharge.

IT IS SO ORDERED.

---

**7.** Remand in these circumstances is consistent with the Supreme Court's treatment of petitions for writs of certiorari since *Transportation Management Corp.,* raising the discharge issue. In several cases the Court has granted the petition for a writ of certiorari, vacated the judgment entered below, and remanded the case for further consideration in light of *Transportation Management Corp. See NLRB v.*

*United Parcel Service, Inc.,* —— U.S. ——, 104 S.Ct. 419, 78 L.Ed.2d 355 (1983); *NLRB v. New York University Medical Center,* —— U.S. ——, 104 S.Ct. 53, 78 L.Ed.2d 73 (1983); *NLRB v. Blackstone Co.,* —— U.S. ——, 103 S.Ct. 3105, 77 L.Ed.2d 1360 (1983); *NLRB v. Heartland Food Warehouse,* —— U.S. ——, 103 S.Ct. 3104, 77 L.Ed.2d 1359 (1983).