**In re Walter Y. SASAKI, Debtor.**

**Kimie MATSUDA, Plaintiff,**

v.

**Walter SASAKI, Defendant.**

**Bankruptcy No. 85–00483.**
**Adv. No. 86–0145.**

United States Bankruptcy Court,
D. Hawaii.

March 13, 1987.

---

Dennis J. Davis, Honolulu, Hawaii, for plaintiff.

Edward C. Kemper, Honolulu, Hawaii, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JON J. CHINEN, Bankruptcy Judge.

The Complaint To Determine Dischargeability of Debt was heard before the undersigned Judge on January 26 and February 2, 1987. Dennis J. Davis, Esq. represented Kimie Matsuda ("Plaintiff") and Edward C. Kemper, Esq. represented Walter Y. Sasaki ("Debtor"). Based upon the evidence adduced, the records in the file, demeanor of the witnesses, and argument of counsel, the court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. The Plaintiff and the Debtor are residents of the City and County of Honolulu, State of Hawaii.

2. Debtor is a general insurance agent, an investment counselor and a real estate salesman. In early 1974, a mutual acquaintance recommended that Debtor contact Plaintiff concerning some insurance coverage. Plaintiff in 1974 owned a small "Mom

and Pop" store in the Wahiawa area, City and County of Honolulu.

3. When Debtor first approached Plaintiff at her store in Wahiawa, sometime around July of 1974, he was alone. Debtor first informed Plaintiff that he was an insurance man and inquired whether she was interested in insurance coverage. Because her brother handled the family's insurance, Plaintiff declined to place any insurance with Debtor.

4. Debtor then talked about a land development on the Island of Hawaii and stated that he was looking for investors. At this first meeting, Plaintiff did not commit herself.

5. On his second and third visit to Plaintiff's store, Debtor was accompanied by Albert Soloff, the developer himself. Debtor did most of the talking, with Mr. Soloff saying only a few words. Debtor informed Plaintiff that she would receive double the money invested. As a result, at the third meeting, Plaintiff agreed to invest $5000.00 for the land development.

6. On Debtor's next visit, he was alone and Plaintiff gave Debtor a check for $5,000.00 dated August 23, 1974. Debtor did not issue to Plaintiff any receipt or any other document evidencing the investment. Debtor subsequently informed Plaintiff that he had placed the $5000.00 in a "good investment." But, Debtor actually had deposited the money into his own account and had used it for his own purpose.

7. Also, sometime in August of 1974, Debtor purchased an apartment ("Apartment") on the Island of Hawaii for $68,500.00. The down payment was $14,500.00 and the balance was financed by a mortgage of approximately $54,000.00. The monthly carrying charge was approximately $750.00.

8. After Debtor received the $5,000.00 check from Plaintiff, Debtor visited Plaintiff's store often, about once in two weeks. At one of this later meetings, sometime in October, 1974, Debtor solicited the Plaintiff to invest with him as an equal partner in the Apartment. Debtor offered Plaintiff a 50% interest in the Apartment for a down payment of $7,500.00 and $350.00 a month to cover the carrying costs.

9. In late October 1974, Plaintiff accepted Debtor's offer with the understanding that, instead of $350.00 a month, she would pay $700.00 every other month to cover her share of the carrying costs.

10. Plaintiff then gave Debtor a check for $1000.00 on October 16, 1974 and a check for $4,000.00 on November 8, 1974. Prior to and subsequent to giving Debtor the two checks, Plaintiff gave Debtor $2,500.00 in cash to make up her share of the $7,500.00 down payment.

11. Debtor went to Plaintiff's store for the checks, but then met Plaintiff at Straub Clinic in Honolulu for the cash contributions. In addition to the $2,500.00 cash acknowledged by Debtor, Plaintiff testified that she gave to Plaintiff $700.00 in cash on seven different occasions, for a total of $4,900.00. Debtor does not recall the $4,900.00 cash payments.

12. Around June or July of 1975, Debtor informed Plaintiff that in the near future no monthly payments would be necessary because the monthly rental income should be adequate to cover the carrying costs.

13. The last payment was made by Plaintiff on October 30, 1975 for the months of November and December, 1975. When Plaintiff informed Debtor that she was not making any more payments toward the carrying costs, Debtor agreed that was satisfactory to him. Subsequent thereto, Debtor visited Plaintiff, but did not request further payments.

14. About December 1975, Plaintiff closed her "Mom and Pop" store. Thereafter, she tried to contact Debtor at his office on Bishop Street, Honolulu, but there was no answer to her telephone calls. She also left several messages with Debtor's wife, but Debtor failed to return her calls.

15. Finally, Plaintiff managed to contact Debtor sometime in August of 1976 and requested some form of evidence to reflect the investments she had made through him. However, instead of re-

ceipts, Debtor prepared and gave Plaintiff two promissory notes, dated August 23, 1976. One note was for $7,167.01 and another was for $10,695.67. After glancing at the promissory notes, Plaintiff filed them away. She believed that they were evidence of her investments through Debtor and that her investments were still good.

16. Sometime in June of 1979, Debtor sold the Apartment for $117,000.00 and used all of the funds for his personal use. He did not inform Plaintiff of the sale of the Apartment.

17. In mid–1983, Plaintiff approached her attorney to have her will prepared. In discussing her estate, Plaintiff informed the attorney of her investments with Debtor and showed the attorney the two notes. The attorney investigated the status of the Apartment and learned that it had been sold in 1979. Plaintiff thus learned for the first time that she no longer had any investment in the Apartment. As a result, on August 2, 1983, she filed a Complaint against Debtor in the State Circuit Court.

18. In answer to the Complaint, Defendant admitted receiving at least $12,500.00 but alleged that this was a personal loan and not an investment. He further asserted that the notes were usurious because they provided for a return greater than the 12% allowed by law.

19. Though Plaintiff received a summary judgment in the state court action, it was remanded for further hearing. The appellate court held that, because the return was greater than 12%, whether the money received was invested or loaned was a material fact. One day before the retrial, Debtor filed his Chapter 7 petition on October 9, 1985.

20. On the notice for meeting of creditors, the last day for filing a complaint to determine dischargeability of a debt was set for October 25, 1986. On September 30, 1986, Plaintiff filed her adversary complaint.

21. The Plaintiff contends that Debtor owes $17,862.68 in principal and $19,544.20 in interest, plus $7,316.60 in attorney's fees, less $3,073.69 paid on the state court judgment.

22. The Debtor testified that he had on several occasions offered a mortgage on the Apartment in favor of Plaintiff to cover her contributions, but that she had declined his offer. He also testified that he had explained his financial difficulties to Plaintiff, that he had to put three children through school, two through college and one through an expensive private school, costing approximately $20,000.00 a year. Debtor testified that Plaintiff sympathized with his financial condition, and that the checks and cash turned over to him by Plaintiff were all loans by a sympathetic, kind lady.

24. Though Debtor testified that he had financial difficulties, he also testified that he had made loans to Mr. Soloff many many times and that he had funds to purchase and furnish the Apartment

25. Debtor also testified that, prior to Plaintiff's agreement to invest in the land development, Mr. Soloff did most of the presentation.

26. Contrary to Debtor's testimony, Plaintiff testified that Debtor never mentioned granting her a mortgage in her favor on the Apartment, never mentioned his financial difficulties and his need to put his children through school.

27. A Mrs. Teruya testified on behalf of Plaintiff. She stated that Debtor visited her with Mr. Soloff for purposes of having her invest with him and that Debtor did the talking, that Mr. Soloff said few words, if any. She further testified that Debtor promised a double return of her investment, but that she also lost most of her money which she had invested with Debtor.

## CONCLUSIONS OF LAW

This is a core matter and this court has jurisdiction of the subject matter and of the parties involved.

There are two primary issues before this court:

1. Are the debts non-dischargeable pursuant to 11 U.S.C. Sec. 523(a)(4)?

2. Does the Statute of Limitation bar Plaintiff's action?

At the outset, the court states that it finds the testimony of Debtor to be incredible. Plaintiff and Debtor were mere casual acquaintance in 1974, having met sometime in June or July of of that year. After such a short acquaintance, the court does not believe that Plaintiff would loan large sums of money to Debtor so that he could spend $20,000.00 a year to send his children to expensive schools, especially children whom she did not know and did not even meet.

The court also finds contradictions in Debtor's testimony. He testified that he was short of funds, thus he had to borrow money from Plaintiff for his children's education. Yet, he also testified that he made loans to Mr. Soloff "many, many times" and that he was able to purchase the Apartment and to fully furnish it for rental purposes.

I.  Are the debts non-dischargeable?

Section 523(a)(4) provides as follows:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

The court finds that Plaintiff is an elderly lady who originally placed great trust and confidence in Debtor. The court further finds that Debtor is a man of the world, experienced in the field of insurance, investment and real estate.

Debtor first solicited investment from Plaintiff for a land development on the Island of Hawaii. Plaintiff was persuaded by the impressive presentation made by Debtor and gave Debtor $5,000.00 to be invested. Instead of investing the money, Debtor used the money for his own purpose. But, he informed Plaintiff that he had placed her money in a "good investment".

Subsequent to receiving the $5,000.00 from Plaintiff, Debtor solicited Plaintiff's investment in an Apartment on the Island of Hawaii, which Apartment he had earlier purchased. After an agreement was reached as to the method of payment towards the monthly carrying costs, Plaintiff accepted Debtor's offer to become an equal partner in the Apartment.

Plaintiff paid Debtor $7,500.00 towards the down payment and subsequently paid $700.00 every two months until October 1975. Debtor had informed Plaintiff sometime in June or July of 1975 that, shortly thereafter, it would not be necessary to make the monthly payments because the monthly income would be adequate to cover the monthly carrying costs. And, so, in October of 1975, Plaintiff informed Debtor that she was no longer making the monthly payments, to which Debtor was agreeable. Thereafter, Debtor visited Plaintiff several times but did not request her for any additional monthly payments.

The Court notes that paragraph 6 of the Complaint states:

6.  In late 1975 and early 1976 plaintiff became concerned because Defendant was no longer contacting her to collect the monthly maintenance fee for her investment. She confronted the Defendant and demanded the refund of the funds she had invested. The Defendant had converted the funds to his own use and had not invested them for her. He did not have the ability to repay the Plaintiff and tendered the notes as evidence of his debt to the Plaintiff.

However, the evidence actually shows that Plaintiff was not aware that Debtor had converted the funds to his own use until 1983. Instead, the evidence shows that, when Debtor sent to Plaintiff the two notes in 1976, Plaintiff believed that the notes were evidence of her investment interests with the Debtor and that her investments were still good.

The evidence shows that in response to Plaintiff's request for evidence of her investments made with Debtor for the land and for the Apartment, Debtor carefully prepared two promissory notes and sent them to Plaintiff. Debtor did not explain to Plaintiff that, instead of showing her to be an investor, these notes showed her to

be a "lender" and the Debtor to be a "borrower".

The Court finds that Debtor, in preparing the notes, had no intent to honor them. Thus, he deliberately inserted usurious rates, so that he would have a defense in the event Plaintiff brought any action on the notes.

When Debtor sent the notes to Plaintiff, he did not explain that, with the notes, he was attempting to change Plaintiff's investment to a loan transaction. Debtor hoped that Plaintiff would believe that the notes were the evidence of her investment she had requested. And Plaintiff so believed. She believed in 1976 that her investment with Debtor was still good. Thus, Debtor again succeeded in misleading Plaintiff. The Court finds that the notes were part of Debtor's scheme to defraud Plaintiff.

Federal Rule of Civil Procedure ("FRCP") 15(b) states:

> (b) Amendments to Conform to the Evidence. When issues *not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.* Such amendment of the pleadings as may be necessary *to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.* If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence. (Emphasis added).

In Wright and Miller, Federal Practice and Procedure, Section 1491 (1971) the authors state:

> Although it always is preferable to move under Rule 15(a) to amend the pleadings before trial, there are instances in which the need to do so does not become apparent until so close to trial, or after the trial has actually commenced, that the request for a change can be made only when the trial is under way. Moreover, on *occasion the course of the trial departs so materially from the image of the controversy pictured in the pleadings or by the discovery process that it become necessary to adjust the pleadings to reflect the case as it actually was litigated in the courtroom.* Rule 15(b) is designed to serve that purpose. (Emphasis added).

FRCP 15(b) is designed to "avoid the tyranny of formalism" that was characteristic of the code pleading system. *Rosden v. Leuthold*, 274 F.2d 747 (1960). As noted by *Wright and Miller, Federal Practice and Procedure*, Section 1491,

> [A]t common law and to a lesser degree under the codes, the pleadings completely controlled the subsequent phases of the litigation. Evidence offered at trial that was at variance with allegations in the pleadings generally could not be admitted, or even if admitted would not be allowed to provide the basis for the final disposition of the action. Federal Rule 15(b) is designed to eliminate the harshness of this earlier practice. The two procedures provided for in the rule are intended to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim or defense that was made at a preliminary point in the action and later proves to be erroneous. Consequently, courts should interpret subdivision (b) liberally and permit an amendment whenever doing so will effectuate the underlying purpose of the rule....

An amendment will be allowed only if the parties have received actual notice of an unpleaded issue and have been given an adequate opportunity to cure any sur-

prise that might result from the change in the pleadings. Before a newly raised issue can become part of the action, it must be tried with the consent of the parties, or if the evidence is challenged, the objecting party must be given an opportunity to demonstrate that the introduction of the evidence at trial is so prejudicial that the detrimental effect cannot be cured by a continuance or the imposition of some other condition on allowing the amendment. (Footnotes omitted).

In *Kuhn v. Civil Aeronautics Board*, 183 F.2d 839, (1950), the Court stated:

It is now generally accepted that there may be no subsequent challenge of issues actually litigated, if there has been actual notice and adequate opportunity to cure surprise. If it is clear that the parties understand exactly what the issues are when the proceeding are had, they cannot thereafter claim surprise or lack of due process because of alleged deficiencies in the language of particular pleadings. Actuality of notice there must be, but the actuality, not the technicality, must govern.

■ FRCP 15(b) does not require that a conforming amendment be made. The issues actually litigated will still determine the outcome. *See e.g. Wasik v. Borg*, 423 F.2d 44 (2d Cir.1970); *Decker v. Korth*, 219 F.2d 732 (10th Cir.1955), *cert. denied*, 350 U.S. 830, 76 S.Ct. 61, 100 L.Ed. 740 (1970).

■ In this case, the issue of whether Plaintiff knew in 1976 that the notes represented evidence of Plaintiff's investment or whether they represented evidence of Debtor's indebtedness to Plaintiff was heard with the implied consent of Plaintiff and Debtor, since the evidence was heard without Debtor's objection. *See e.g. Arkla Exploration Co. v. Boren*, 411 F.2d 879 (8th Cir.1969); *U.S. v. Stephen Brothers Line*, 384 F.2d 118 (5th Cir.1967).

■ Once a court determines that an issue has actually been litigated with the consent of the parties, the court would have to grant a motion to amend the pleadings. *See e.g. Bradford Audio Corp. v. Pious*, 392 F.2d 67 (2d Cir.1968).

Amendments have been permitted to correct facts that were misstated in the pleadings. *See e.g. NLRB v. Merrill*, 388 F.2d 514 (10th Cir.1968). FRCP 15(b) provides that a motion to amend may be made even after the entry of a judgment. Although as a matter of course, Plaintiff should amend the pleadings, the failure to do so does not alter the adjudication on the merits.

Notwithstanding Paragraph 6 of the Complaint, the Court thus finds that Plaintiff believed that the notes were evidence of her investments and that, in 1976, her investments were still in effect and good.

Hawaii Revised Statutes ("HRS") 657–20 states:

If any person who is liable to any of the actions mentioned in this part or section 663–33, fraudulently conceals the existence of the cause of action or the identity of any person who is liable for the claim from the knowledge of the person entitled to bring the action, the action may be commenced at any time within six years after the person who is entitled to bring the same discovers or should have discovered, the existence of the cause of action or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

In *Au v. Au*, 63 Hawaii 210, 215, 626 P.2d 173, the Hawaii Supreme Court adopted the definition of fraudulent concealment as the

"employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent." *Lemson v. General Motors Corp.*, 66 Mich.App. 94, 97, 238 N.W.2d 414, 415 (1975) quoting *De Haan v. Winter*, 258 Mich. 293, 296, 241 N.W. 923, 924 (1932). Fraudulent concealment involves the actions taken by a liable party to conceal a known cause of action.

In this case, when Plaintiff asked debtor for evidence of her investments, Debtor instead supplied two promissory notes with which Debtor intended to conceal the true nature of his acts. Further, the Debtor is knowledgeable in insurance as well as real estate and knew or should have known about usurious rates. When he prepared the promissory notes, Debtor used a usurious interest rate, and thus provided himself an affirmative defense on any proceeding to collect on the notes. Debtor thus effectively concealed the action for fraud by representing to Plaintiff that the promissory notes were actually evidence of Plaintiff's investment interests, while at the same time providing an affirmative defense for himself should an action on the notes be commenced.

Debtor knew Plaintiff to be an elderly, trusting lady, and prepared the notes in order to prevent any further inquiry by the Plaintiff into her investments. It was not until 1983 that Plaintiff learned of the fraud. The Statute of Limitations began to run at the time of the discovery of the concealment in 1983.

In *Kang v. Harrington*, 59 Hawaii 652, 587 P.2d 285 (1978), the Hawaii Supreme Court noted that failure for a party to discover the fraud will not negate the fraud where the fraud was intentional and deliberate. The Court stated:

> [W]here it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled, or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by saying the the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care. *Cummins v. Cummins*, 24 Haw. 116, 122 (1917) quoting from *Linington v. Strong*, 107 Ill. 295, 302 (1883). *See also Anderson v. Knox*, 297 F.2d 702, 711 (9th Cir.1961).

■ The Bankruptcy Court, as a Court of Equity, may look through form to substance of transaction and devise new remedies where those in law are inadequate. *In re Global Western Development Corp.*, 759 F.2d 724 (C.A. 9, 1985).

And as Justice Douglas observed in *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939),

> The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. *They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.* (emphasis added) (footnote omitted).

Id. at 304–05, 60 S.Ct. at 244.

■ In the instant case, when Plaintiff asked for some form of evidence of her investment, Debtor prepared and sent to Plaintiff the two promissory notes. Because it was Debtor's hope that Plaintiff would believe that the notes were the evidence she had requested and because Plaintiff so believed, the court only finds it equitable that the notes are considered as evidence of Plaintiff's investments with Debtor and that the notes did not change the relationship into a loan arrangement. By this interpretation, this court will make certain that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.

As the court stated in *In re Crook*, 13 B.R. 794 (Bkrtcy.Me.1981):

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. 3 *Collier on Bankruptcy* (15th ed. 1980) ¶ 523.14[3] at 523–106. Under the Code embezzlement need not have been committed while in a fiduciary capacity to be found nondischargeable. 3 *Collier on Bankruptcy* (15th ed. 1980) ¶ 523.14[1][c] at 523–98.

■ The court finds that Debtor fraudulently appropriated money from Plaintiff, which had been entrusted in his care. There was embezzlement on the part of Debtor. Thus, the debts owing to Plaintiff

by Debtor are non-dischargeable under Section 523(a)(4).

## II. Does the Statute of Limitation bar Plaintiff's action?

■ Though Plaintiff gave $5,000.00 to Debtor in 1974 to invest in Soloff's land development, Debtor failed to invest the money as directed but used it for his own purpose. Plaintiff first became aware of this embezzlement in 1983, after the suit in the state court had been filed in 1983. Likewise, Plaintiff did not become aware of the sale of the Apartment until 1983.

Since Plaintiff learned of the fraud and embezzlement in 1983, she had six years thereafter within which to bring her action against Debtor. The Complaint in the Bankruptcy Court having been filed in 1986, the court finds that the action was timely filed.

The Bankruptcy Court is a Court of Equity to assist the honest debtor who has met with financial difficulties because of circumstances beyond his control. It is not a place of refuge for the dishonest, especially for those who prey on the trusting "Golden Girls".

In the instant case, the court finds that, through fraud, false representations and embezzlement, the Debtor obtained money from Plaintiff for investment purposes but used for his personal benefit. The court finds the actions of Debtor in violation of Section 523(a)(4) and the debts owing to Plaintiff in the Complaint are non-dischargeable as follows:

|  | Principal | Interest |
|---|---|---|
| Land Investment: | $ 5,000.00 | $ 7,200.00 |
| Apartment Investment: | $12,300.00 | 16,236.00 |
| Attorney's fees: | $ 7,316.60 | |
| | (less $3,073.69 paid on judgment) | |

A Judgment will be signed upon presentment.