730 F.2d 586
 115 L.R.R.M. (BNA) 3242, 100 Lab.Cas. P 10,864
 The ARTRA GROUP, INC. (formerly known as Dutch Boy, Inc.,
Glow-Lite Division), Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
International Union of Electrical, Radio and Machine
Workers, AFL-CIO-CLC, Intervenor.
 No. 82-1727.
 United States Court of Appeals,
Tenth Circuit.
 March 15, 1984.
 
 Ira Michael Shepard, Washington, D.C. (Paul Monroe Heylman, Washington, D.C., with him on briefs; Schmeltzer, Aptaker & Sheppard, P.C., Washington, D.C., of counsel), for petitioner.
 Lawrence E. Blatnik, Atty. N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., with him on brief), for respondent.
 Carole W. Wilson, Washington, D.C. (Robert Friedman, Washington, D.C., with her on brief), for intervenor.
 Before DOYLE, McKAY and SEYMOUR, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The matter which is here presented is the review of a decision of the National Labor Relations Board. The NLRB has cross-appealed for an enforcement of its order.
 
 
 2
 The Employer is the manufacturer of small indicator lights in Pauls Valley, Oklahoma. Basically the suit grows out of an effort on the part of a group of employees to organize a union, and the opposition by the Employer to these efforts. To obtain the names and addresses of other employees, one Carl Whitfield, who was the main organizer of the Union, and one Steve Hinkel, a co-worker, conducted a bean count contest in late January, 1977. To enter the contest, employees had to supply their names, addresses and telephone numbers. The parties dispute whether the Employer gained knowledge of the organizational activities from this contest. In any event, considerable organizational activities were pursued. In early 1977 a decision was made to hold an organizational meeting on February 10. Word of this apparently spread and many employees approached Whitfield about the meeting on February 9. The Employer posted a notice on either February 9 or 10, which indicated that a layoff would take place on February 11. Carl Whitfield was told he was either going to be discharged or he could accept a voluntary layoff.
 
 
 3
 The Administrative Law Judge found that Whitfield was told that he would be discharged for destroying company property, after he had thrown some paper away. This was within the findings of the Administrative Law Judge, Page 7.
 
 
 4
 In any event, the meeting was held on February 10, as scheduled, and 25 employees attended. The Board's opinion indicated that the Employer began making anti-union statements and that some of these statements were coercive and violative of the employees' rights under 29 U.S.C. Sec. 157 and 158(a)(1) of the National Labor Relations Act.
 
 
 5
 On February 11, 1977, the first layoff took place with respect to 55 employees, including Whitfield, the one who was leading the effort. The charge was that the Employer continued to threaten employees. It also continued to interrogate employees, attempted to remove Union leaders from the bargaining unit, and promulgated rules in an attempt to thwart union activities. Also, commencing later that month the 55 employees who had been laid off were recalled at various times. Whitfield was not recalled until August 1, 1977, which bespeaks something. He was the last employee to be recalled, although he apparently was one of the most senior employees laid off.
 
 
 6
 As late as March 10, a clear majority of the production and maintenance employees had signed authorization cards. The Union requested recognition as the bargaining representative, but the Employer declined to so recognize it, and the Union instituted representation proceedings.
 
 
 7
 On May 13, 1977, the Employer laid off 73 employees. Most of these were recalled in June and July.
 
 
 8
 A representation election was scheduled for July 11, 1977. In the interim, the Employer distributed leaflets and made statements to employees which the Union later charged were threatening and coercive. Nevertheless, the Union lost the election. The Union filed charges alleging illegal interference with the election and unfair labor practices. The charges were consolidated. The Employer's basic defense was that the layoffs were the result of economic necessity. On December 15 the Employer granted increased benefits to employees.
 
 
 9
 The case was heard by a Administrative Law Judge (ALJ). He heard a great deal of evidence and following the hearing he wrote an opinion which contained a number of findings of fact. As characterized in the Union's brief, these are as follows:
 
 The Employer had violated the Act by:
 
 10
 1. Interrogating employees concerning their or other employees' Union membership, activities, sympathies or desires;
 
 
 11
 2. Threatening employees with plant closure or cessation of operations, if they continued their Union activities or if they selected the Union as their collective-bargaining representative;
 
 
 12
 3. Threatening employees with discharge, or refusals to recall or rehire, or with other reprisals if they engaged in Union activities;
 
 
 13
 4. Threatening to rescind previously granted wage increases or to deny employees future wage increases, because they engaged in Union activities or because they refused to accede to Company attempts to coercively remove employees from the bargaining unit;
 
 
 14
 5. Threatening, impliedly, to engage in reprisals against employees if they refused Company orders to cease their Union activities or support;
 
 
 15
 6. Creating or giving the impression that employees' Union activities were under surveillance;
 
 
 16
 7. Engaging in surveillance of employees' Union activities;
 
 
 17
 8. Discriminatorily prohibiting employees from distributing pro-Union literature;
 
 
 18
 9. Coercively attempting to remove non-supervisory Union leaders from the bargaining unit;
 
 
 19
 10. Unilaterally granting wage increases and other benefits in order to discourage employee support for the Union;
 
 
 20
 11. Making unilateral changes in the terms and conditions of its employees without first notifying and consulting with the Union, the majority representative of the employees;
 
 
 21
 12. Laying off 55 employees, including the leading Union proponent, for engaging in Union and protected activities;
 
 
 22
 13. Laying off 73 employees on May 13, for engaging in Union and protected activities;
 
 
 23
 14. Refusing to recall and delaying recall of laid off employees to discourage employee support for the Union; and
 
 
 24
 15. Refusing to bargain with the Union as the majority representative of its employees.
 
 
 25
 Based on the findings as set forth above, the Administrative Law Judge issued cease and desist orders, and also directed the Employer to offer full reinstatement to those employees laid off on February 11, 1977 and May 13, 1977, and to make the employees whole for any losses of pay. In addition, the Administrative Law Judge ordered the Employer to recognize and, upon request, bargain with the Union as the exclusive representative of the employees.
 
 
 26
 The cause was then appealed to the National Labor Relations Board, which determined the appeal based on the briefs and the record. The effect of the NLRB's determination was to generally affirm the ALJ, with some modifications. The ALJ's findings were revised with respect to the Employer's promulgation of a no-talking, no-fraternization rule on February 16, 1977. It was held by the ALJ that this did not violate the Act. In addition, the Board reversed the ALJ's ruling that a statement by the Employer on May 6, 1977 was not coercive. The Board also considered the ALJ's bargaining order pursuant to the precedent set in N.L.R.B. v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).
 
 
 27
 The Board affirmed the ALJ's order requiring collective bargaining, but the court noted that the ALJ had failed to provide a rationale for this extraordinary remedy. The Board supplied this by finding that "the possibility of erasing the Respondent's unfair labor practices and of ensuring a fair rerun election by use of traditional remedies was slight, and that the employees' representational sentiment once expressed through authorization cards would, on balance, be better protected by our issuance of a bargaining order than by traditional remedies." Dutch Boy, Inc., Glow-Lite Division and International Union and Electrical Radio & Machine Workers, AFL-CIO-CLC, 262 NLRB 1, 1982.
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 We now consider the Employer's contentions of error on the part of both the Administrative Law Judge and the National Labor Relations Board. We must point out that the area of review is quite narrow here. The findings of the Board with respect to questions of fact are conclusive if supported by "substantial evidence, on the record, considered as a whole * * * Whether, in a given case, there is substantial evidence to support the Board's findings is a question which Congress has placed in the keeping of the Courts of Appeal, and such Court should only intervene in what ought to be the rare instance when the standard appears to have been misapprehended or grossly misapplied." See Ann Lee Sportswear, Inc. v. N.L.R.B., 543 F.2d 739 (10th Cir.1976). Also, the decision of the Administrative Law Judge is part of the record and is to be considered as well. N.L.R.B. v. Warren L. Rose Castings, Inc., 587 F.2d 1005 (9th Cir.1978). This standard does not change even though the Board disagrees with the findings made by the Administrative Law Judge. As indicated above the review is limited. The court certainly does not retry the case. It neither undertakes to weigh the credibility of witnesses, nor does it search for contradictory inferences. N.L.R.B. v. Wilhow Corp., 666 F.2d 1294 (10th Cir.1981).
 
 
 31
 Although numerous, unfair labor practices were charged and found, the primary issue on appeal is the propriety of the February and May layoffs. The Board held that these layoffs were the result of anti-union animus and that the layoffs were an attempt by the Employer to thrwart the Union organizational campaign. In so holding, the Board rejected the Employer's defense that the layoffs were caused by economic necessity.
 
 I. THE EMPLOYER'S ECONOMIC DEFENSES
 
 32
 The defense theory was that the things that had been carried out by the Employer were justified economically. The Employer even sought to justify the layoffs on the basis of economic factors. This included the February and May, 1977 layoffs. The position of the Employer was that it was the decline of his economic position and not any unlawful motivation or anti-union animus that caused the layoffs. The Employer argues that the Board failed to consider the economic evidence; and that the Board's opening merely noted that the Employer had failed to present a credible explanation for the layoffs.
 
 
 33
 The Board could possibly have written a more detailed opinion, but it was not error for the Board to decide the case in the manner in which it did. After all it did adopt the findings of the Administrative Law Judge who had considered the evidence in detail and had held that the evidence failed to support the Employer's position that the layoffs were the result of economic factors. It is not uncommon for Administrative Law Judge's findings to provide a rationale and in this case it has been held to be sufficient. Thus, the Board is not required to restate everything if it finds that the Administrative Law Judge's conclusions are fair and supported by the evidence. N.L.R.B. v. Permanent Label Corp., 657 F.2d 512 (3d Cir.1981), cert. denied, 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982). In the case just cited the court was considering the necessity for articulating rationales for a bargaining order. The reasoning that the Board need not restate everything is certainly applicable here. No error is to be found in the Board's reaching its conclusion summarily when it has adopted the detailed findings of the Administrative Law Judge.
 
 
 34
 The Employer's next economic defense is to the effect that the Administrative Law Judge erred in refusing to consider all of its economic defense evidence. According to the Employer, the Administrative Law Judge considered evidence of bookings but not of sales in considering the condition of the market. (Bookings are orders, while a sale occurs when a shipment is sent to a customer.) The Employer's position is that had the ALJ fully considered the sales evidence, he would have reached the conclusion that the layoffs were dictated by economic factors. The Administrative Law Judge's position was that the Employer was not able to rely on its evidence of sales in proving his economic position, "in view of its earlier oft-repeated claims that the bookings were the basis of the decision." Even if it is assumed that this is the equivalent of a refusal to consider evidence of sales as the Employer contends, there is no basis for this court to reject the findings of the Administrative Law Judge. The decision not to consider evidence is within the discretion of the ALJ. N.L.R.B. v. Tonkawa Refining Company, 452 F.2d 900, 903 (10th Cir.1971). On appeal, the Employer has failed to establish that this decision was an abuse of discretion. It must be noted that the ALJ did not exclude all of the evidence of the Employer's economic defense. The Administrative Law Judge considered the evidence regarding bookings in a thorough manner and came to the conclusion that the Employer had not established that economic factors necessitated the layoff. The ALJ also noted that the recalls were slow and that, in fact, new persons were hired prior to the recall of laid off employees.
 
 
 35
 II. THE CONTENTION OF THE EMPLOYER THAT THERE IS A FAILURE
 
 
 36
 TO CONSIDER THE CASE OF WRIGHT LINE, A DIVISION OF WRIGHT
 
 
 37
 LINE, INC., 251 NLRB 1083 (1980), Enf'd, 662 F.2d 899 (1st
 
 
 38
 Cir.1981), Cert. Denied, 455 U.S. 989, 102 S.Ct. 1612, 71
 
 
 39
 L.Ed.2d 848 (1982).
 
 
 40
 In Wright Line, the Board set forth the procedure for dealing with what have been called mixed motive cases, i.e., cases in which there are charges that the employer's action was the result of anti-union animus, while the employer at the same time asserts that he is moved by valid motives. In the Wright Line case an employee was discharged. The union alleged that the employer discharged the employee because of union activities, while the employer's position was that the discharge had nothing to do with the protected union activities. The Board determined that while the union or NLRB general counsel had the burden of persuading the Board that anti-union animus contributed to the employer's action, the employer could avoid a finding of a violation by demonstrating, (to the extent of a preponderance of the evidence) that the same action would have occurred even if the discharged employee had not been involved in union activities. Procedurally this is an affirmative defense and the union or NLRB general counsel retains the burden of proving the elements of an unfair labor practice. This allocation of the burden of proof was recently approved by the United States Supreme Court. N.L.R.B. v. Transportation Management Corp., --- U.S. ----, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).
 
 
 41
 On behalf of the Employer it is said that the alleged failure of the Board and the Administrative Law Judge to consider or analyze the Employer's evidence of economic justification violates the standard set forth in Wright Line. In addition, the Employer argues that the Board failed to apply the Wright Line analysis to the evidence presented. But as brought out above, the Administrative Law Judge and the Board did consider the Employer's economic defense. The Administrative Law Judge while not using the exact words "Wright Line test" obviously applied that standard. See, for example, with respect to the February 11 layoff, the ALJ observed, "I cannot conclude that the respondent has established a credible defense to the strong prima facie case established by general counsel." (Decision of the ALJ, at Page 16, JD-1-81.) The Board adopted this finding and held that the respondent offered no credible explanation for its precipitant decision to lay off so many employees so quickly. 262 NLRB 1 (1982).
 
 
 42
 It is apparent from the above that the economic defense failed not because of lack of consideration, nor was it because an improper standard was applied, but rather the ALJ and the Board found that the Employer's economic defense lacked credibility. The number of the ALJ's findings of fact are to the effect that he found the asserted economic defense not to be credible. The ALJ appraised this matter and said:
 
 
 43
 Respondent gave so many and diverse explanations for these latter two alterations of its June 1977 booking records (and indeed never did give any credible explanation therefor), that it is concluded that there was no actual need for layoff in May, but that the Respondent sought, by altering its records, to make it appear that such layoff was economically required.
 
 
 44
 ALJ's Decision, at Page 41, JD-1-81.
 
 
 45
 We have previously held that " * * * it is not within our province to upset a credibility determination of a hearing officer absent extraordinary circumstance." Osteopathic Hospital Founders Association v. N.L.R.B., 618 F.2d 633, 638 (10th Cir.1980). No such circumstances as those referred to are present here, and thus no basis exists to revise the findings of the ALJ or the Board, with respect to the Employer's defense of economic conditions. The Employer's objections to many of the findings of fact regarding the February and May layoffs are not sustainable. The Administrative Law Judge heard lengthy conflicting testimony and examined many exhibits. The conclusions and inferences to be reached are in support of the ALJ, and indeed, it should be given particular deference. N.L.R.B. v. Brookwood Furniture, Div. of U.S. Industries, 701 F.2d 452 (5th Cir.1983). Thus, there appears to be substantial evidence in the record as a whole, to support the factual findings of the Administrative Law Judge, which findings were affirmed by the National Labor Review Board.
 
 III. EMPLOYER'S KNOWLEDGE
 
 46
 The Employer has challenged another finding. That is that it had knowledge of the Union organizing campaign at the time it decided to effectuate the February layoffs. The Employer objects to this finding, because, obviously, if the Employer had no knowledge of the Union activity, the motivation for the layoff would have less standing as anti-union animus. The Employer maintains that the record is completely devoid of evidence which would indicate that it had knowledge of Union activity prior to the February layoffs. The Employer says that the Board based its findings that the Employer had knowledge of Union activity upon the fact that the Union and employees conducted a "bean contest" in order to ascertain the names and addresses of employees in an effort to organize them, and that the Employer knew of the true purpose of the contest. There is no question as to whether the contest occurred in late January or early February, prior to the February layoffs. The Employer asserts that the Board based its finding on the testimony of one employee and that the Board misapprehended the actual testimony. The references are to the testimony of Garland Fuller, a production foreman with the Employer. At the hearing Mr. Fuller stated that he was aware of the contest and he knew the purpose of the contest; that it was for the Union to obtain the names and addresses of employees. His testimony also was that he had not figured out the purpose of the contest "until after the Union had already taken hold." There does not appear to be any further explanation of the timing of Fuller's knowledge. The Employer contends that the Board misrepresented his testimony to mean that the Employer had knowledge prior to the February layoffs. The Employer seeks to establish that there was no knowledge of the Union activity until after the February layoffs. However, the Board concluded that based on the record the Employer had knowledge of the Union activity prior to the February layoffs. On a reading of the record it would appear that there was so much interest in the effort to organize the Union and so much opposition on the part of the Employer that it necessarily was aware of every move that was made in the direction of forming a Union. Thus the Board concluded that based on the record the Employer had knowledge of the Union activity prior to the February layoffs. Our view is that it was so obvious and it had so much interest that there must have been Employer knowledge.
 
 
 47
 Certainly this court is not solely bound by the testimony of Garland Fuller on the bean contest, because the Board's finding of the Employer's knowledge of Union activity was surely based on more. It was pointed out by the Board that Whitfield, who was a Union activist, was observed and reprimanded prior to the February layoffs. It was also found that the fact that a Union meeting was to be held on February 10 was common knowledge among employees, and from that the Board drew the inference that the Employer had knowledge. We are certainly not going to search to find contradictory inferences, and we need not do so. NLRB v. Wilhow Corp., 666 F.2d 1294 (10th Cir.1981). In any event, there is substantial evidence in the record, as a whole, to support the Board's finding that the Employer had knowledge of Union organizational activity prior to the February layoff.
 
 
 48
 IV. THE BARGAINING ORDER.
 
 
 49
 As indicated above, the Administrative Law Judge issued a bargaining order which directed the Employer to bargain with the Union. The ALJ failed to indicate the rationale for this order, but on appeal to the Board, the Board supplied the justification. In NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the United States Supreme Court approved the use of a bargaining order as a remedy when unfair labor practices have been committed that would undermine a fair election process. Here, the Board found that the numerous unfair labor practices, which included the layoffs, the promulgation of a no-talking, no-fraternization rule which was imposed in a discriminatory manner, coercive remarks and explicit and implicit threats of closure if the Union won the election warranted the issuance of a bargaining order. The Board found that the Employer had embarked on a course of retaliatory unfair labor practices from the beginning of the Union's campaign.
 
 
 50
 The Employer urges on this court that it is entitled to have a reversal of the bargaining order on the ground that as the layoffs were lawful, no bargaining order should issue. But this court finds no basis to reverse the Board's findings regarding the unlawfulness of the layoffs. It is not going to reverse the remedy of a bargaining order which was deemed appropriate by the Board. The Board's position that it is a proper remedy is based on its expertise, and the choice of remedy is entitled to special respect by appellate courts. NLRB v. Gissel Packing Co., 395 U.S. 575, 613 n. 32, 89 S.Ct. 1918, 1939, n. 32, 23 L.Ed.2d 547 (1969).
 
 
 51
 The cross-appeal by the NLRB seeking enforcement of its order is granted.