**INTERMOUNTAIN RURAL ELECTRIC ASSOCIATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1228.

United States Court of Appeals, Tenth Circuit.

April 16, 1984.

Martin Semple, Denver, Colo. (Good & Stettner, P.C., Denver, Colo., were on brief), for petitioner.

David Marshall, Atty., N.L.R.B., Washington, D.C. (Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Miriam Szapiro, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief), for respondent.

Before HOLLOWAY, McWILLIAMS and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

Intermountain Rural Electric Association (employer) appeals from a decision by the National Labor Relations Board (Board) finding that it had committed numerous unfair labor practices. This case was tried before an administrative law judge (ALJ). The employer was found to have violated § 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act. 29 U.S.C. § 158(a). The Board affirmed the ALJ's decision, 253 N.L.R.B. 1153, III R. 1290. The employer petitioned for review and the Board cross-petitioned for enforcement.

**1.** Unilaterally altering a mandatory bargaining subject while an agreement is in force violates the Act. *See NLRB v. C & C Plywood Corp.,* 385 U.S. 421, 425, 87 S.Ct. 559, 562, 17 L.Ed.2d 486 (1967); *NLRB v. Katz,* 369 U.S. 736, 742–43, 747, 82 S.Ct. 1107, 1111, 1113, 8 L.Ed.2d 230 (1962).

**2.** Failing to provide such documents can violate the Act. *See Detroit Edison Co. v. NLRB,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979);

## I

### *The factual setting*

#### A. *Unchallenged unfair labor practices*

The Board affirmed the ALJ's rulings, findings and conclusions, and adopted his recommended order. III R. 1290. The ALJ discussed the employer's unfair labor practices, and we only summarily outline those that the employer does not challenge. The so-called outside or production and maintenance employees had a collective bargaining agreement with the employer. A dispute arose concerning the feasibility of the pension plan agreed on in the collective bargaining agreement. The ALJ found that the employer violated § 8(a)(1) and (5) by unilaterally altering a mandatory bargaining subject during the term of a bargaining agreement, III R. 1263,[1] and by failing to comply with the request for documents relevant to the duty of the International Brotherhood of Electrical Workers, Local No. 111 (Union) to represent its members. III R. 1264.[2] During the imbroglio surrounding the pension plan, a campaign to organize the employer's so-called inside or clerical employees began. For its actions during this campaign, the employer was found to have violated § 8(a)(1) by unlawfully questioning and intimidating one of its employees, and by permitting memoranda to reach employees which threatened to obstruct the exercise of their rights under the Act. III R. 12.[3] The employer has not petitioned for review of these findings. Opening Brief of Petitioner at 12 n. 2. Accordingly, they are entitled to summary enforcement. *Retail Clerks Union Local 1401 v. NLRB,* 463 F.2d 316, 320 (D.C.Cir.1972); *Riverside Press, Inc. v. NLRB,* 415 F.2d 281, 284–85 (5th Cir.1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970).

*NLRB v. Truitt Manufacturing Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *Safeway Stores, Inc. v. NLRB,* 691 F.2d 953, 956–57 (10th Cir.1982).

**3.** Threatening employees with loss of benefits during an organizing campaign may violate § 8(a)(1). *E.g., McLane/Western Inc. v. NLRB,* 723 F.2d 1454, 1456 (10th Cir.1983).

## B. *Challenged unfair labor practices*

The employer has challenged the findings that it violated § 8(a)(1) and (3) when it suspended and subsequently discharged Katherine Tate (Tate), and reprimanded Kathleen Gunton (Gunton). Both Tate and Gunton were active in organizing the inside or office employees. The catalyst for the employer's disciplinary action against Tate and Gunton was an incident on July 5, 1979. The ALJ found the following facts.

On July 5, irate utility customers, whose power had been cut off, left a bag of spoiled food in the reception area. After the customers departed, there was much merriment surrounding the incident. Mr. Cronk, the employer's operating manager, had attempted to assuage the irascible customers' mood. Cronk was "seemingly a willing participant in the fun." III R. 1273. The spoiled groceries were near Tate who was operating the switchboard. When Cronk began to leave, Tate asked that he take the garbage with him; she said that if he did not she would put it on his desk. Cronk refused. When Tate said that she did not sit with trash, Cronk retorted "[g]o ahead and have a wildcat walkout." III R. 1273; *see also* I R. 122 (testimony of Tate). Upon hearing this, Tate picked up her belongings and began to leave the area. Before she had gone far, a call came through the switchboard. She returned to answer it, and finished out her shift. I R. 122 (testimony of Tate); I R. 555 (testimony of Cronk).

Cronk returned to his office and "after a few minutes of contemplation" became upset with Tate. I R. 122 (testimony of Tate); I R. 555 (testimony of Cronk). He reported her action to Mr. Deans—Tate's immediate supervisor and the Director of Electrical Engineering. Deans told Tate that she might be suspended and to see him after work. Thereupon Tate asked Gunton to be present (which the employer strenuously denies) as a witness when she spoke with Deans.

After work, Gunton went to Tate's office work area. Two other clerical employees were there at the time. I R. 127, 131–32, 234. When Deans told Tate that she probably would be suspended, Tate looked out the door to Gunton. I R. 234. In response, Gunton entered Deans' office. Deans told Gunton to "get the hell out," and when she started to say something, he stood up and told her to get out. Gunton promptly left. For this incident she was given a written reprimand which went into her personnel file.

Tate was suspended for three days for her actions during the spoiled food incident. Upon her return, she showed Deans a note that she had from her doctor that "strongly" recommended that she be given a week off and that the company should not "underestimate the importance of this." Deans consulted Mr. Lewandowski, the employer's chief operating officer about Tate's requested leave of absence. Lewandowski phoned the clinic and learned that a doctor with the same name that appeared at the end of the letter was employed there. Lewandowski denied the request without any inquiry into the seriousness of Tate's health problem. I R. 444.[4]

When Tate learned that her request for leave had been denied, she said that she had to follow her doctor's orders. Deans told Tate that if she were not at work she would probably be fired. Tate said she would return in a week and left. Tate was fired when she failed to appear for work.

---

4. Lewandowski testified that he denied Tate's request because: (1) she was needed at work; (2) in his opinion there was no medical emergency; and (3) there was no pressing reason to grant the request. I R. 405.

In a memorandum concerning this incident, Deans gave three reasons for denying Tate's request. Deans wrote that: (1) leaves of absences are only granted if they will not interfere with the efficient operation of the company; (2) Tate was needed because her suspension had produced a backlog of work, and (3) the doctor's note did not state that a medical emergency existed. III R. 1275–76.

It also appears that the employer was suspicious that Tate intended to take a vacation if she were granted her requested leave. I R. 404. In fact Tate did take a trip during the week she was absent from work. I R. 180–81.

As to Gunton the ALJ concluded, and the Board agreed, that by entering Deans' office on Tate's behalf and proposing that an attempt be made to reach Cronk for clarification of Tate's job status, Gunton had joined with Tate "for the purpose of ... mutual aid and protection," which was protected by § 7 of the Act, so that the ensuing reprimand of Gunton violated § 8(a)(1). Further, it was considered that the reprimand of Gunton, while triggered by Gunton's activities in aid of Tate, in fact was in recrimination for her union sympathies and activities, thereby violating § 8(a)(3) in addition to § 8(a)(1).

As to Tate the ALJ concluded, and the Board agreed, that the 3-day suspension and subsequent discharge of Tate in July 1979 were prompted by Tate's union sympathies and activities, in violation of § 8(a)(3) and (1); that these conclusions were drawn because of common knowledge among management that Tate was prominently prounion; that the employer had been intent on building a case against Tate; that the spoiled-food incident was seized on as a convenient pretext for punishing Tate for her union involvement; that the reasons for denying her requested leave were unconvincing; and that the July 5, 1979 suspension and July 13 discharge of Tate were in violation of § 8(a)(3) and (1). III R. 1278–79.

In addition the ALJ noted that despite recurrent determinations to the contrary in the representation case, the employer persisted in contending Tate was a confidential employee and, as such, was outside the protection of the Act. No findings were made on the factual nature of Tate's status as secretary to Deans, or whether Tate's position was such that she was a confidential employee assisting and acting in a confidential capacity to those handling management policies in the field of labor relations—thus having a "labor-nexus" under Board decisions. See NLRB v. Hendricks County Rural Electric Corp., 454 U.S. 170, 173, 102 S.Ct. 216, 220, 70 L.Ed.2d 323 (1981). Instead of making such findings, the employer's confidential employee defense as to Tate's charges was rejected by the ALJ and the Board by noting that the claim that confidential employees do not enjoy the protection of the Act is inconsistent with current Board law.

On the basis of the findings and conclusions made the Board ordered remedial relief for Gunton and Tate, as well as on the unchallenged violations. In this review proceeding the employer argues that (1) the Board erred by refusing to allow the employer to relitigate the question of Tate's status as a confidential employee and, on review of the record, the evidence supports a finding that Tate was such an employee; (2) the Board's finding that the employer violated the Act by dismissing Tate for taking an unauthorized leave of absence is not supported by the record; (3) the Board applied an incorrect standard in determining that Tate's discharge violated the Act, not applying the *Wright Line* test; (4) the Board erred in finding that Tate's suspension for leaving her work station violated the Act; and (5) the Board erred in finding that Gunton's interruption of a confidential interview was protected concerted activity.

## II

### *Tate's suspension and discharge*

The ALJ determined that, in violation of § 8(a)(1) and (3), the employer suspended and subsequently discharged Tate because of her union sympathies and activities. III R. 1278. We must uphold findings of the Board if they are supported by substantial evidence, when viewed in the light that the record in its entirety furnishes. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *McLane/Western Inc. v. NLRB*, 723 F.2d 1454, 1457 (10th Cir.1983); *Safeway Stores, Inc. v. NLRB*, 691 F.2d 953, 956 (10th Cir.1982). We turn first to the question whether the record as a whole supports the Board's findings respecting Tate's suspension and discharge.

### *Substantiality of the evidence to support the findings*

■ Tate was actively involved in union activities. I R. 102–04. The employer was

aware of this. I R. 105, 107, 117, 150, 378, 409; Deposition of Deans at 47–48. When an employee who is active in union affairs is disciplined or discharged, it can give rise to an inference of violative discrimination. *See NLRB v. First National Bank of Pueblo*, 623 F.2d 686, 692 (10th Cir.1980) (recognizing that such an inference is permissible but not permitting it in view of employee's very limited union activity); *Head Division, AMF, Inc. v. NLRB*, 593 F.2d 972, 975 (10th Cir.1979) (inference permitted where employee actively engaged in union activities); *NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 1002 (10th Cir. 1977) (permitting inference). Such discrimination must generally be proven by circumstantial evidence. *Head Division v. NLRB, supra*, 593 F.2d at 975; *see also McLane/Western, supra*, 723 F.2d at 1459 ("An employer's anti-union motive generally may be proven only by circumstantial evidence."). Buttressing this inference are statements made by Deans indicating his hostility towards Tate's union involvement. Deans admitted that Tate's union sentiments were a source of discomfort to him because of what he believed was the confidential nature of her duties. The way Deans "looked at it" either Tate would have to be terminated or she would have to agree not to belong to the union. Deposition of Deans at 73–74.[5]

It is also probative that the employer began keeping a file on Tate's errors soon after Deans became uncomfortable with Tate's union sentiments. Deposition of Deans 74, 75–79. This suggests that the employer sought to manufacture a case against Tate. Although the employer argues that the file was kept because of a legitimate concern with the quality of Tate's work, Opening Brief of Petitioner at 20, the ALJ found that the weight of the evidence demonstrated that Tate was a more than adequate employee. III R. 26. Despite the evidence that the employer has offered to refute this, the inference the Board has drawn has adequate support in the record,[6] and we will not disturb it. *See Worley Mills, Inc. v. NLRB*, 685 F.2d 362, 364 (10th Cir.1982) ("We are unable to re-evaluate the evidence when conflicting views have been presented and the Board has chosen a version which is adequately supported by the evidence."); *NLRB v. Wilhow Corp.*, 666 F.2d 1294, 1299, (10th Cir.1981) ("We are not authorized to make contrary alternative inferences from the record evidence where there is substantial evidence to support the Board's determination.").

In addition, the circumstances surrounding both the suspension and discharge of Tate also support the Board's findings. As to the suspension, it was found that the atmosphere surrounding the spoiled food incident was jovial and that the incident was used as a pretext to punish Tate for her union sympathies. III R. 1273, 1278. There is substantial evidence that this was the case. Cronk admitted that there was kidding surrounding the incident. I R. 569–70. Moreover, Tate's discharge followed what the Board found to be an unlawfully motivated suspension of Tate. *Cf. McLane/Western v. NLRB, supra*, 723 F.2d at 1460 n. 5 (timing of discharge supports unfair labor practice charge). Furthermore the events surrounding the denial of Tate's request for leave suggest that the employer was searching for a reason to discipline her. After Tate gave Deans the letter from her physician recommending that she be given a one week leave of absence, Deans took the letter to Lewandowski because Deans

---

**5.** We note also that Tate testified that when Cronk told her that she was scheduled to attend training regarding a new phone system, he said "that is, if you're still here …, oh, I shouldn't say that. You will file an unfair labor charge against me." I R. 110.

**6.** Deans wrote Tate a letter of recommendation. Although it was never typed, it did say that Tate was "capable of performing her duties in a highly efficient and professional manner." II R. 755. We recognize that the letter did close with a joke. However, we are not convinced that this demonstrates that the ALJ erred in believing that the rest of the letter was a sincere evaluation of Tate's performance.

was unsure how to handle the matter. Although Tate's appearance suggested that she might have a health problem,[7] Lewandowski denied the request without making an inquiry into the seriousness of her health problem. I R. 443–44. For these reasons we hold that there was substantial evidence to support the Board's findings that Tate was unlawfully suspended and discharged.[8]

The employer argues that even if the General Counsel made a prima facie case of unlawful discharge, the employer demonstrated that its action would have been taken regardless of illegal motivation; that Tate was absent without leave; that the General Counsel offered no evidence concerning Tate's physical or emotional condition; and thus under the *Wright Line* analysis which should have been followed, the finding of violation of § 8(a)(1) and (3) by Tate's discharge must be vacated. Opening Brief of Petitioner 31–35.

We find no fatal defect in the record on this point. The ALJ's conclusions, adopted by the Board and supported by the record, included the conclusion that the spoiled food incident was "seized upon as a convenient pretext to punish [Tate] for her union involvement;" that the employer "was intent upon building a case against Tate" which was inferrable from instructions given to Deans, within about one month before Tate's July 5, 1979, suspension and her July 13, 1979 discharge, to keep track of examples of error in Tate's work; that the weight of the evidence, including Deans' previous letter of recommendation of Tate,

undercuts the bona fides of the documentation procedure; and that Lewandowski's professed reservations over the form of the doctor's note could only be described as the quibbling of one with an ulterior motive. II R. 1278–79. Thus the findings can fairly be read, with record support, to rule out the possibility of the employer's prevailing on the theory of a *Wright Line* defense and no remand is necessary to restate the findings in terms of *Wright Line* analysis. *See McLane/Western, supra,* 723 F.2d at 1461; *The Artra Group, Inc., v. NLRB,* 730 F.2d 586, 591, 592 (10th Cir.1984).

In sum, the record as a whole supports the Board's findings as to the unfair labor practice charges concerning Tate's suspension and discharge.

### The employer's confidential employee defense

■ The employer strenuously contends that Tate was a confidential secretary and thus not entitled to the protection of the Act; that the employer was entitled to relitigate this issue in this unfair labor practice proceeding; and that it was denied this right.

We must agree that the employer was entitled to relitigate its assertions that Tate was a confidential employee. In an unfair labor practice proceeding under § 8(a)(1) and (3), the Board's regulations, 29 C.F.R. § 102.67(f) (1983),[9] do not prevent relitigation of common issues that were decided in an earlier representation hearing. This proceeding is not a subsequent "related"

---

**7.** Deans testified that Tate looked tired and her eyes were bloodshot when she presented the note from her doctor. Deposition of Deans at 37.

**8.** We recognize that the Act does not permit interference with the employer's normal exercise of its right to hire and fire employees. That the Board may disagree with the employer's action is unimportant as long as the employer is free from illegal motivations. *See, e.g., McLane/Western, supra,* 723 F.2d at 1459; *NLRB v. First National Bank of Pueblo,* 623 F.2d 686, 693–94 (10th Cir.1980). Here, however, we are satisfied that there was sufficient record evidence to support the Board's findings that the

employer was unlawfully motivated in carrying out the suspension and dismissal of Tate.

**9.** Section 102.67(f) provides:

The parties may, at any time, waive their right to request review. Failure to request review shall preclude such parties from relitigating in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding. Denial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding.
29 C.F.R. § 102.67(f) (1983).

proceeding so that § 102.67(f) would bar relitigation of the confidential employee issue. *See NLRB v. Dillon Stores,* 643 F.2d 687 (10th Cir.1981).[10]

■ We must carefully delineate the Board's handling of this confidential employee defense asserted in the instant case in light of the similar problems and the holding of the Supreme Court in *NLRB v. Hendricks County Rural Electric Membership Corp.,* 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981). In *Hendricks,* the Court reviewed Board decisions before 1947, the Taft-Hartley Act, and its legislative history. It concluded that it had been the Board's practice before Taft-Hartley to apply a labor-nexus test to identify confidential employees excluded from bargaining units and that there was nothing in the Taft-Hartley legislative history providing support for the argument that Congress disapproved of that Board practice; that to the contrary the history indicated that Congress intended to leave that historic practice undisturbed. *Id.* at 185, 102 S.Ct. at 226. Because there was no attack on the Board's finding that the confidential secretary there did not have a labor-nexus, the Court remanded with directions to enforce the Board's remedial order on the § 8(a)(1) charge. *Id.* at 191, 102 S.Ct. at 229.

The Court did not decide the broad question which Board counsel argues in the instant case, namely that all confidential employees are properly entitled to the protection of the Act. The Court was not called on to decide the propriety of the Board's practice of affording even "labor-nexus" employees some protections of the Act, and the question was not addressed. *Id.* at 185–86, n. 19, 102 S.Ct. at 226 n. 19.

As the employer points out in the instant case, evidence was presented here concerning confidential information to which Tate was privy. The employer says Tate, who was secretary to Deans, the Director of Electrical Engineering, acted in a confidential capacity as to Deans, that her work placed her in a position of confidence where she had access to confidential information, that the evidence showed Tate was privy to important information other than labor relations matters not available to the public, that Deans fulfilled an important role in formulating and implementing labor relations policy of the employer, and also that as Deans' confidential secretary Tate typed memoranda on the employer's position on issues being negotiated with the union. Opening Brief of Petitioner 14–16. The employer argues that under either the broad definition that all confidential secretaries are excluded from coverage of the Act (as the Seventh Circuit held in *Hendricks*), or the Board's definition limiting such confidential employees to those with a "labor-nexus," Tate was a confidential employee and accordingly she did not enjoy the protection of the Act.[11] Opening Brief of Petitioner 16–17.

**10.** In *Dillon* we recognized that 29 C.F.R. § 102.67(f) "bars litigation of an issue determined in a representation hearing only when the subsequent hearing is a 'related' proceeding," *NLRB v. Dillon Stores, supra,* 643 F.2d at 690, and that "[m]ost courts addressing the issue have concluded that unfair labor practice proceedings under section 8(a)(1) or (3) are not so related to prior representation hearings that relitigation of common issues is precluded." *Id.* We, therefore, held that it was permissible for the General Counsel to relitigate whether particular employees were supervisors so that the employer could be held responsible for their conduct, and guilty of an unfair labor practice. *See also Rock Hill Telephone Co. v. NLRB,* 605 F.2d 139 (4th Cir.1979) (same as *Dillon*); *Heights Funeral Home, Inc. v. NLRB,* 385 F.2d 879 (5th Cir.1967) (preventing employer from relitigating supervisory status is error requiring remand); *Amalgamated Clothing Workers of America v. NLRB,* 365 F.2d 898 (D.C.Cir.1966) (same as *Heights Funeral Home*). Because 8(a)(1) and (3) charges are at issue in the instant case, § 102.67(f) would not bar relitigation of issues decided in the previous representation hearing.

**11.** When the employer sought to raise the issue of Tate's confidential status in this unfair labor practice proceeding, the ALJ tentatively sustained an objection that this issue was foreclosed because the employer had earlier litigated this question and lost. I R. 152–54. The ALJ, however, recognized that the area was not free from doubt, and told the employer's counsel to bring citations to supporting authorities in the following morning if he wanted to pursue the matter. I R. 154. The following morning, the ALJ considered the employer's authorities and

We noted earlier that the ALJ's findings, adopted by the Board, did not determine the status or type of relationship Tate had under the *Hendricks* classifications. Instead the ALJ and the Board acknowledged the assertions of the employer, referred to the earlier determinations by the Regional Director against the employer's assertions that Tate was a confidential employee, and then dismissed the employer's assertions that Tate did not enjoy the protection of the Act as contrary to current Board law. III R. 1278 n. 20.

Since the employer's arguments were advanced the Supreme Court has decided *Hendricks.* The employer's contention based on the Seventh Circuit's view in *Hendricks*—that all confidential secretaries are excluded from the Act, without regard to labor relations information—is now untenable. However the additional contention of the employer that Tate was a confidential secretary with a labor-nexus must be considered. We feel that there was sufficient evidence presented on this theory that it might be found that Tate was within that category, being a confidential secretary having a labor-nexus. This was not determined by the Board's findings. Without such a factual determination by the Board, which has that fact-finding function, we should not dispose of the alternate contention of the employer that Tate did not enjoy the protection of the Act because she was a confidential secretary with a "labor-nexus."

We conclude that we should not rule on the part of the case relating to Tate on what would be essentially a hypothetical question, *i.e.*, was she entitled to the protection of the Act assuming that she was a confidential employee. Fact-finding on that question and the degree of sensitivity of information to which Tate was privy could be of critical importance. In the pos-

ture in which the instant case comes to us, we do not know if we have a "labor-nexus" confidential employee issue. The Board avoided the question and made no findings on the status or relationship of Tate. If it were determined that Tate was not a confidential secretary, assisting and acting in a confidential capacity to persons who formulate, determine and effectuate management policies in the field of labor relations, then she would be in a position like the secretary in *Hendricks* and the Board should afford remedial relief on the unfair labor practice charges.

Accordingly, while we uphold the Board's findings against the challenge that the record does not support the findings of unlawful suspension and discharge, we must remand the portion of the case relating to Tate. The confidential employee defense cannot be properly decided until the Board makes proper findings as to whether Tate was a confidential secretary with a labor-nexus, or whether she was outside that classification. We remand this part of the case for further proceedings the Board deems necessary, for findings and conclusions on the confidential employee defense in light of the classifications identified in *Hendricks*, and for an order thereon. We have not, and do not intend by this opinion, to rule on the question of law whether confidential employees having a labor-nexus are entitled to the protection of the Act against unfair labor practices of the type involved here. That issue remains for the Board to rule on in the first instance if required by the findings it makes on the confidential employee defense.

### III

#### *Gunton's reprimand*

■ The ALJ found that reprimanding Gunton for her actions in trying to come to

---

ruled that he would permit the record in the representation case to be made part of the record in the unfair labor practice proceeding. Additionally other evidence on this issue could be admitted as long as it did not duplicate material that was part of the record in the representation case. I R. 189–97.

The employer put on evidence that Tate was a confidential employee, and that she did have

access to confidential material pertaining to labor relations matters. I R. 376–79, 392–99, 446–47, 458–59, 461–62, 510–13, 589–91. However, as we have explained, the ALJ did not rule on Tate's status. Rather he reasoned that even if Tate were a confidential employee, it is Board policy that she is nevertheless protected by the Act.

the aid of Tate in Deans' office violated § 8(a)(1) because Gunton had joined with Tate for mutual aid and protection. The reprimand therefore interfered with the exercise of § 7 rights. 29 U.S.C. § 157. In addition, the ALJ found that the reprimand was in recrimination for Gunton's union activities and thereby constituted independent § 8(a)(1) and (3) violations, which include discouragement of union membership. III R. 1272. The employer argues that Gunton's action was neither concerted nor protected. Opening Brief of Petitioner 9–12, 38–42. We are convinced, however, that the record supports the finding of concerted and protected activity. We also conclude that there is substantial evidence to support the finding of unlawful discrimination in reprimanding Gunton because of her union activities.

The Board concluded that Gunton, by entering Deans' office on Tate's behalf and proposing that an attempt be made to reach Cronk for clarification of Tate's job status, joined with Tate for the purpose of mutual aid and protection. III R. 1272. This mutually protective action was undertaken by two employees who had been active in the effort to organize the office employees. The Board's holding is a permissible construction of "concerted activities for ... mutual aid or protection" by the agency charged by Congress with enforcement of the Act, and should be sustained. *NLRB v. Weingarten, Inc.*, 420 U.S. 251, 260, 95 S.Ct. 959, 965, 43 L.Ed.2d 171 (1975); *see NLRB v. Modern Carpet Industries, Inc.*, 611 F.2d 811, 813–14 (10th Cir.1979); *NLRB v. Empire Gas, Inc.*, 566 F.2d 681, 686 (10th Cir.1977) (question whether activities are protected by the Act

is one on which courts defer to Board expertise); *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 505–06 (2d Cir.1942) (opinion of L. Hand, J., quoted by the Supreme Court in *Weingarten*, 420 U.S. at 261, 95 S.Ct. at 965).[12] We thus conclude that the Board's finding of the separate § 8(a)(1) and (3) violations by the written reprimand of Gunton is supported by the record.

■ It was also concluded by the Board that the reprimand of Gunton, while triggered by her activities in behalf of Tate, was in recrimination for her union sympathies and activities. III R. 1272. This conclusion is also supported by the record. It was widely known that Gunton was a prime mover in the union organizing effort, I R. 228, 409, 571–72, and the employer admits that she was. Opening Brief of Petitioner 10. As noted, when an employee who is active in union affairs is discharged, it can give rise to an inference of violative discrimination. *See First National Bank of Pueblo, supra*, 623 F.2d at 692; *Head Division AMF, Inc. v. NLRB, supra*, 593 F.2d at 975; *Montgomery Ward, supra*, 554 F.2d at 1002. Gunton testified that her involvement with the union organizing campaign was very strong. I R. 228. The testimony of Stanley Lewandowski, the employer's chief operating officer, and of Spencer Cronk, the employer's director of operations, make clear that the employer was aware of Gunton's active support for the union. I R. 409, 571–73.

Further, the employer committed other unfair labor practices.[13] This fact suggests that the employer was hostile to the union, and the presence of anti-union ani-

---

**12.** We note that the Supreme Court's recent decision in *NLRB v. City Disposal Systems, Inc.*, —— U.S. ——, ——, 104 S.Ct. 1505, 1512–13, 79 L.Ed.2d 839 (1984), discusses the § 7 recognition of the acts of joining and assisting a labor organization as concerted. The Court then discussed individual employee assistance to a labor organization and noted that "[b]ecause of the integral relationship among the employees' [organizational] actions, however, Congress viewed each employee as engaged in concerted activity." *Id.* The actions of Gunton in assisting her fellow union supporter Tate, whose status was

threatened, could reasonably be found to be protected concerted activity, as the Board did.

**13.** The employer has not challenged findings that it committed unfair labor practices by (1) unilaterally altering a mandatory bargaining subject during the term of an agreement; (2) failing to provide the union with documents relevant to its duty; (3) unlawfully questioning employees about their union sympathies; and (4) permitting threatening memoranda to reach employees.

mus lends support to the inference that Gunton was unlawfully reprimanded. *See NLRB v. Automotive Controls Corp.*, 406 F.2d 221, 226 (10th Cir.1969) (upholding Board finding of unlawful discharge and permitting Board to rely in part on evidence of company's anti-union animus as demonstrated by § 8(a)(1) violations); *NLRB v. Georgia Rug Mill*, 308 F.2d 89, 91 (5th Cir.1962) (anti-union bias is significant factor in determining motive); *see also NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 166 (3d Cir.1977) ("prior unfair labor practices demonstrate the company's propensity for [violating the Act] and suggest that its post-election grant of benefits was likewise improperly motivated.").

We are also convinced that the record supports an inference that Gunton was discriminatorily disciplined. The written reprimand of Gunton said that she entered Deans' office without authorization and with no official duties to perform, and that employees were not authorized to visit other areas of the building after working hours unless they had authorization or official business to conduct. Though the evidence indicates that other employees stayed in the building after hours,[14] Lewandowski's testimony establishes that only Gunton received a written reprimand for such conduct between January 1978 and November 1979 when the ALJ heard the case. I R. 15. That only Gunton was disciplined for activity in which other employees engaged further supports the conclusion that her reprimand was in recrimination for her union activities. *Cf. Head Division, AMF, Inc. v. NLRB*, 593 F.2d 972, 975–76 (10th Cir.1979) ("NLRB was

not unreasonable in concluding that [employee]" was unlawfully discharged when he was only employee ever discharged for committing act—"without prior warning or attention to less extreme disciplinary sanctions"); *NLRB v. Big Three Industrial Gas & Equipment Co.*, 579 F.2d 304, 312 (5th Cir.1978) ("otherwise valid rule may be discriminatorily applied to penalize those who assert rights protected under the Labor Act."), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979); *NLRB v. Heck's Inc.*, 386 F.2d 317, 320 (4th Cir.1967) ("well settled that enforcement of otherwise valid rule only against those engaging in union activities is discriminatory").

We conclude that the record as a whole supports the Board's finding that Gunton's reprimand was a violation of §§ 8(a)(1) and (3). Moreover, while the Board's findings do not go through the step-by-step *Wright Line* analysis, *see NLRB v. Transportation Management*, ⸺ U.S. ⸺, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), we are convinced that consideration was given to the theory of defense the employer asserts and that the rejection of it is supported by the record.[15] We conclude that the findings can fairly be read, with record support, to rule out the possibility of the employer's prevailing on a defense under the *Wright Line* theory; therefore a remand to restate the findings in terms of the *Wright Line* analysis is unnecessary. *See McLane/Western, supra*, 723 F.2d at 1461; *The Artra Group, Inc. v. NLRB*, 730 F.2d 586, 591, 592 (10th Cir.1984).[16]

In sum, we uphold the Board's findings and conclusions concerning Gunton's writ-

---

**14.** Deans testified that when he went to his office to discuss the spoiled food incident with Tate, there were employees other than Gunton present. Deposition of Deans at 26. Another employee testified that she often stayed in the building after office hours while waiting for her softball practice to begin. I R. 276–78. *See also* I R. 127, 131–32, 234.

**15.** For example, we note that the Board found that the terms of the reprimand of Gunton "betray[ ] pretext." II R. 1273.

**16.** We are mindful of the fact that we are ordering enforcement of the remedial order as to Gunton premised on the conclusion that she

and Tate were engaging in protected concerted activity, when the ultimate determination after these proceedings are all completed might be that Tate herself was not entitled to the protection of the Act. We feel, however, that this relief for Gunton would be proper even if Tate were ultimately held not to be entitled to the protection of the Act since, at the time Gunton acted, Tate had been determined to be within the bargaining unit and Gunton had a reasonable basis for joining Tate's cause in the protected concerted action.

We do not make a similar ruling in Tate's favor on the basis of justifiable reliance by Tate at that time on the earlier rulings because to do

ten reprimand and will enforce the order thereon.

## IV

For the reasons stated, the Board's order will be enforced in all respects except as to the suspension and discharge of employee Tate. With respect to the suspension and discharge of Tate, the case is partially remanded to the Board for further proceedings on the employer's confidential employee defense as provided herein, this court retaining jurisdiction following such proceedings to review determinations of the Board which are challenged and to consider any further application made for enforcement.

so would defeat the employer's right to relitigate its assertion that Tate was a confidential employee. Moreover, the remedial order as to Gunton would be proper also on the separate basis that the Board found that the employer's reprimand of Gunton was in recrimination for Gunton's prounion sympathies and activities, a separate §§ 8(a)(1) and (3) violation.